IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF OKLAHOMA

FILED
MAY 3 1 2002
Phil Lombardi, Clerk
U.S. DISTRICT COURT

| | |
|---|---|
| WILLIAM S. FLETCHER, CHARLES A., PRATT, JUANITA W. WEST, CORA JEAN JECH, BETTY WOODY, and JOHN BERREY, Individually, and as members of the OSAGE DEVELOPMENT COUNCIL, <br><br> Plaintiffs, <br><br> v. <br><br> THE UNITED STATES OF AMERCIA; THE DEPARTMENT OF THE INTERIOR; GALE NORTON, Secretary of the Interior; THE BUREAU OF INDIAN AFFAIRS; NEAL McCALEB, Assistant Secretary of the Interior – Indian Affairs, <br><br> Defendants. | 02CV 427 E (M) Case No. _____ <br><br><br> DEMAND FOR JURY TRIAL <br><br> ATTORNEY LIEN |

## COMPLAINT

1. The Plaintiffs, William S. Fletcher, Charles A. Pratt, Juanita W. West, Cora Jean Jech, Betty Woody, John Berrey, individually, and as Members of the Osage Development Council, (the "Plaintiffs") for their claim for relief against the Department of the Interior; Gale Norton, Secretary of the Interior; The Bureau of Indian Affairs; Neal McCaleb, Assistant Secretary of the Interior – Indian Affairs (collectively the "Defendants") alleges and states:

## STATEMENT OF JURISDICTION

2. This complaint contains multiple claims relating to the Defendants' wrongful administrative establishment of a voting process for officials for the Osage Tribe of Oklahoma (the "Tribe") which violates the first and fifth amendment to the United States Constitution, and for the Defendants' illegal agency actions, and for the Defendants'

breach of the federal Indian trust responsibility as they relate to the defendants' failure to safeguard Osage "mineral allotments" or "headrights" from alienation. The Plaintiffs' claims arise under U.S. Const. Amend. I & V; 5 U.S.C. § 702 and 706, and 28 U.S.C. §§ 1343, 1346, 1361 and 1362, all as more fully set forth below. This Court has jurisdiction by reason of these aforementioned laws and under Title 28, United States Code, Section 1331.

3.   Plaintiffs are descendants of individuals who were listed on the rolls of the Osage Tribe. Some of the Plaintiffs are unable to participate in the government of the Osage Tribe because of the regulations imposed upon the Tribe in 25 C.F.R. pt. 90 which require that any member of the Osage Tribe must first own at least an interest in an Osage mineral allotment before holding or voting for an elective office in the Osage Tribe. Others of the plaintiffs are forced to vote more than once at each election, and feel that this is a violation of their right to "one person, one vote."

4.   The Department of the Interior (the "Interior") is a United States agency with the responsibility to provide for oversight and superintendence of federally recognized Indian tribes, a part of which is encompassed in Interior's trust responsibility to the Tribe and its people. Gale Norton is currently the Secretary of Interior.

5.   The Bureau of Indian Affairs (the "Bureau") is a sub-bureau, and an agency within Interior that has the responsibility for executing upon the substantial trust responsibilities to the Osage Tribe and its people. Neal McCaleb is currently the Assistant-Secretary for Indian Affairs.

## COMMON ALLEGATIONS

6.   Paragraphs 1 through 5 are incorporated by reference.

7. The United States government through the Interior and the Bureau were delegated the authority to determine the manner in which elections for the elected officials of the Osage government are conducted. Further, the Interior and the Bureau have substantial responsibilities for the management of the mineral allotments or "headrights" of the individual members of the Osage Tribe.

8. The Defendants have breached these responsibilities by improperly changing the meaning of "member of the Osage Tribe" to mean that to vote in tribal election, to hold elected office, or to receive distributions from the Tribe's mineral reservation, an Osage Indian must also first have an interest in, or own a mineral allotment, otherwise known as a "headright," or a piece of one.

9. The Interior's regulations that provide for this mechanism are not founded on the Acts of Congress, or on Tribal law.

10. Section 7 of the act of March 2, 1929 (45 Stat. 1481) provides in part as follows:

> That there shall be a quadrennial election of officers of the Osage Tribe as follows: A principal chief, an assistant principal chief, and eight members of the Osage tribal council, to succeed the officers elected in the year 1928, said officers to be elected at a general election to be held in the town of Pawhuska, Oklahoma, on the first Monday in June 1930 and on the first Monday in June each four years thereafter, *in the manner to be prescribed by the Commissioner of Indian Affairs*, and said officers shall be elected for a period of four years commencing on the 1st day of July following said elections. * * *

11. 25 C.F.R. § 90.21 (2001) is the regulation that provides "the manner" prescribed by the Bureau. The regulation provides:

> Only members of the Osage Tribe who will be eighteen years of age or over on election day and whose names appear on the quarterly annuity roll at the Osage Agency as of the last quarterly payment immediately preceding the date of election will be entitled to hold office or vote for any tribal officers. Each such voter shall be entitled to cast one ballot and each ballot shall have exactly the same value as the voter's headright interest

3

> shown on the last quarterly annuity roll. Any fraction of a headright, however, shall be valued as to the first two decimals only unless such interest is less than one- hundredth of a share, then it shall have its full value.

*Id.* (emphasis added).

12. However, the Act of June 28, 1906, 34 Stat. 539 (the "1906 Act") provides that the roll of the Osage Tribe shall determine membership in the Osage Tribe. Section 1 of the 1906 Act provides, in relevant part:

> That the roll of the Osage tribe of Indians, as shown by the records of the United States in the office of the United States Indian Agent as the Osage Agency, Oklahoma Territory, as it existed on the first day of January, nineteen hundred and six, and all children born between January first, nineteen hundred and six, and July first, nineteen hundred and seven, to persons whose names are on said roll January first, nineteen hundred and six, and all children whose names are not now on said roll, but who were born to members of the tribe whose names were on the said roll on January first, nineteen hundred and six, including the children of members of the tribe who have, or who have had, white husbands, is hereby declared to be the roll of said tribe and to constitute the legal membership thereof * * *

*Id.*

13. While 25 C.F.R. § 90.21 essentially limits membership in the Osage Tribe for the purpose of governmental participation, neither the 1906 Act, nor any or its amendments ever imposed such a limitation. Rather, the term "Headright" first appears in any statute relating to the removal of federal restrictions from Osage Indians in 1948, which states in relevant part:

> *Provided,* That all restrictions against alienation of the property of every kind and character, except headright shares or interests in the Osage tribal mineral estate, of members of the Osage Tribe who now have or hereafter receive, a certificate of competency, are hereby removed.

Act of Feb. 5, 1946, Pub. L. 80-408 (the "1948 Act"). This provision clearly indicates a distinction between membership and headright ownership.

4

14. This distinction is even more clearly identified in some of Congress' actions prior to the 1948 Act where Congress dealt with the concept of Osage membership, restrictions, and allotments, and clearly indicated that there were both "allotted" and "unallotted" members of the Osage Tribe. Specifically, Congress stated, in relevant part:

> [U]nless otherwise provided by Act of Congress, ... all royalties and bonuses arising [from the Tribe's reserved mineral interests] shall belong to the Osage Tribe of Indians, and shall be disbursed to members of the Osage Tribe or their heirs or assigns as now provided by law
>
> \*\*\*
>
> Sec. 5 The restrictions concerning lands and funds allotted Osage Indians, as provided in this Act and all prior Acts now in force, shall apply to unallotted Osage Indians born since July 1, 1907, or after the passage of this act, and to their heirs of Osage Indian blood. \*\*\* Provided further, That the Secretary of the Interior is hereby authorized in his discretion to grant a certificate of competency to any unallotted Osage Indian ....

15. Further, even Interior's own regulations clearly indicate that membership in the Osage Nation is not dependent on ownership of a headright. For instance, in 25 C.F.R. § 90.21 shows that one may be a member of the Osage Tribe without owning a headright – or a right to an annuity – where it states:

> Only members of the Osage Tribe who will be eighteen years of age or over on election day and whose names appear on the quarterly annuity roll at the Osage Agency as of the last quarterly payment immediately preceding the date of election will be entitled to hold office or vote for any tribal officers.

*Id.*

16. However, the Defendant's own regulations limit the ability of the Osage Members to participate in their own government, and provide that a large portion of Osage Tribal Members may not run for elective offices or vote for such offices.

17. A person's right to participate in his government and to vote, as provided by the statutes and treaties applicable to the Tribe in question, is protected under

5

federal law. *See Seminole Nation of Oklahoma v. Norton*, 206 F.R.D. 1 (D.D.C. 2001); *Rice v. Cayetano*, 528 U.S. 495, 523, 120 S. Ct. 1044, 1060 (2000) ("Hawaii's final argument is that the voting restriction does no more than ensure an alignment of interests between the fiduciaries and the beneficiaries of a trust ... rests, in the end, on the demeaning premise that citizens of a particular race are somehow more qualified than others to vote on certain matters."). Likewise, in the end, any argument that the Osage voting restriction is justified because it simply aligns with the management of the Osage reserved mineral interests is demeaning to the Tribe and to its members who seek a fuller sense of self government, and do not wish to be marginalized into role of corporate trust overseer.

## FIRST COUNT
## DEPRIVATION OF FUNDAMENTAL RIGHT TO VOTE

18. Paragraphs 1 through 17 are incorporated by reference.

19. Plaintiff complains against defendant and for a first claim for relief alleges:

20. The United States Supreme Court has formulated a "fundamental right to vote." Ronald D. Rotunda & John E. Nowak, *Treatise on Constitutional Law; Substance and Procedure* § 18.31 (Westlaw 2002). As the Supreme Court stated in *Reynolds v. Sims* in the context of reapportionment:

> Legislators represent people, not trees or acres. Legislators are elected by voters, not farms or cities *or economic interests*. As long as ours is a representative form of government, and our legislatures are those instruments of government elected directly by and directly representative of the people, the right to elect legislators in a free and unimpaired fashion is a bedrock of our political system. It could hardly be gainsaid that a constitutional claim had been asserted by an allegation that certain otherwise qualified voters had been entirely prohibited from voting for members of their state legislature. And, if a State should provide that the

6

> votes of citizens in one part of the State should be given two times, or five times, or 10 times the weight of votes of citizens in another part of the State, it could hardly be contended that the right to vote of those residing in the disfavored areas had not been effectively diluted. *It would appear extraordinary to suggest that a State could be constitutionally permitted to enact a law providing that certain of the State's voters could vote two, five, or 10 times for their legislative representatives, while voters living elsewhere could vote only once.* And it is inconceivable that a state law to the effect that, in counting votes for legislators, the votes of citizens in one part of the State would be multiplied by two, five, or 10, while the votes of persons in another area would be counted only at face value, could be constitutionally sustainable.

377 U.S. 533, 562, 84 S. Ct. 1362, 1381 (1964) (emphasis added).

21.     This fundamental right to vote emanates from at least three Constitutional guarantees, the First, Fifth and Fourteenth amendments of the United States Constitution. The first two Constitutional guarantees have application with respect to the Defendant's actions in limiting the Plaintiffs' right to participate in the Osage Tribe's government.

## VIOLATION OF THE RIGHT TO POLITICAL ASSOCIATION

22.     The First Amendment provides:

> Congress shall make no law respecting an establishment of religion, or prohibiting the free exercise thereof; or *abridging the freedom of speech, or of the press*; or the right of the people peaceably to assemble, and to petition the Government for a redress of grievances.

U.S. Const. Amend XVI (emphasis added). This provision has restricted the right of governments to limit the right to affiliate with a political party, or to distribute a petition. *See Buckley v. American Constitutional Law Foundation, Inc.*, 525 U.S. 182, 119 S. Ct. 636 (1999) (restrictions on persons who can circulate petitions for ballot initiatives, including requirements that the circulators be registered voters and wear identifying name tags, violate the First Amendment); *Meyer v. Grant*, 486 U.S. 414, 108 S. Ct. 1886

(1988) (Statute prohibiting the payment of persons to circulate petitions for ballot initiatives violates First Amendment).

23.     Interior's and the Bureau's regulations as they relate to the Osage elections violate the right to political association under the United States Constitution because the regulations deny the Plaintiffs, and thousands of other members of the Osage Tribe who do not own an interest in a Headright, the right to vote or participate in the Tribe's elections of the Tribe's legislators, and the restriction on political involvement eliminates the Plaintiff's ability to participate in political activities like petitions or ballot initiatives.

## UNEQUAL APPLICATION OF LAW

24.     The Fifth Amendment provides:

> No person shall be held to answer for a capital, or otherwise infamous crime, unless on a presentment or indictment of a Grand Jury, except in cases arising in the land or naval forces, or in the Militia, when in actual service in time of War or public danger; nor shall any person be subject for the same offence to be twice put in jeopardy of life or limb; nor shall be compelled in any criminal case to be a witness against himself, nor be deprived of life, liberty, or property, without due process of law; nor shall private property be taken for public use, without just compensation.

U.S. Const. Amend V.

25.     The Fifth Amendment to the United States has been held to encompass, or to imply, a right for United States citizens be protected against the unequal application of laws by Congress and federal agencies. *See Califano v. Goldfarb*, 430 U.S. 199, 97 S. Ct. 1021 (1977) (Gender-based dependency requirement for widowers' benefits under the Social Security Act violated equal protection under the Fifth Amendment).

26.     Further, the Equal Protection guarantee of the Fifth Amendment has applied to suits against the Federal Government. *Morton v. Mancari*, 417 U.S. 535, 555, 94 S. Ct. 2474, 2485 (1974) (upholding employment preference for members of Indian tribes in

Bureau of Indian Affairs); *Washington v. Washington State Commercial Passenger Fishing Vessel Ass'n*, 443 U.S. 658, 673 n. 20, 99 S. Ct. 3055, 3068 n. 20 (1979) (granting of preferential fishing rights to Indians did not violate the principles of equal protection), *opinion modified* 444 U.S. 816, 100 S. Ct. 34 (1979), *on remand* 92 Wn.2d 939, 603 P.2d 819 (1979), *appeal after remand* 641 F.2d 1311 (9th Cir.1981).

27.  And, the Supreme Court has held in *Babbitt v. Youpee*, 519 U.S. 234, 117 S. Ct. 727 (1997) that the Indian Land Consolidation Act violated the Fifth Amendment because the Act required that small fractional interests in tribal property be transferred to the Tribe at the time of the owner's death, rather than being transferred to the persons to whom the property owner had left her estate.

28.  While many of the same Plaintiffs in this case brought similar claims in *Fletcher v. United States*, 116 F.3d 1315 (10th Cir. 1997), the Court there was careful to preserve the claims that are brought in this case, stating, "We hold only that the franchise was improperly extended in this case and that the new government formed under the 1994 Constitution is invalid under the 1906 Act. The issue of whether the headright restriction violates Individual Plaintiffs' equal protection and due process rights, as raised by the second amended complaint, remains an open question." *Id.* at 1329, n. 28.

29.  The Defendants' denial of the Plaintiffs' right to vote in the Osage Tribal elections does not rationally relate to a legitimate governmental purpose. All Osage Tribal members should, and as a legal matter do, have a right to run for elective office in their Tribe, and to vote in elections for those officers. As such, the Defendants' regulations, and their application of these regulations violates the Fifth Amendment of the United States Constitution.

## SECOND COUNT
## BREACH OF THE FEDERAL TRUST RESPONSIBILITY

30. Paragraphs 1 through 29 are incorporated by reference.

31. Plaintiff complains against defendant and for a second claim for relief alleges:

32. A trust, or fiduciary relationship exists where "the Government assumes such elaborate control" over tribal operations. *See United States v. Mitchell*, 103 S. Ct. 2961, 2972, 463 U.S. 206, 225 (1983). "[W]here the Federal Government takes on or has control or supervision over tribal monies or properties, the fiduciary relationship normally exists with respect to such monies or properties (unless Congress has provided otherwise) even though nothing is said expressly in the authorizing or underlying statute (or other fundamental document) about a trust fund, or a trust or fiduciary connection." *Navajo Tribe of Indians v. United States*, 224 Ct.Cl. 171, 183, 624 F.2d 981, 987 (1980).

33. In the same way as in the management of funds, the Federal Government has taken on the control of the Osage tribal voting procedures and elections, and has so completely controlled these elections that they are governed by regulation – unlike any other tribal election in the United States. This pervasive management and control of the Osage Tribal elections creates a trust relationship to each of the Osage Tribal members to ensure that their rights are not violated.

34. The United States Supreme Court defined the nature of the Indian Trust relationship, stating in relevant part:

> In carrying out its treaty obligations with the Indian tribes the Government is something more than a mere contracting party. Under a humane and self imposed policy which has found expression in many acts of Congress and numerous decisions of this Court, it has charged itself with moral obligations of the highest responsibility and trust. Its conduct, as disclosed in the acts of those who represent it in dealings with the Indians, should therefore be judged by the most exacting fiduciary standards.

*Seminole Nation v. United States*, 316 U.S. 286, 296-7, 62 S. Ct. 1049, 1054 (1942).

35.   In this case the Defendants have breached this trust relationship in two ways: 1) the have eliminated the Plaintiffs' rights to participate or vote in Osage Tribal elections, which is a violation of their constitutional right to participate in the imposed democratic form of the Osage government, and 2) they have allowed mineral allotments to be sold to persons on non-Osage blood, allowing both the political and the property rights to be alienated in a manner that was not in the best interest of the Plaintiffs.

### THIRD COUNT
### DEPRIVATION OF PROPERTY

36.   Paragraphs 1 through 35 are incorporated by reference.

37.   Plaintiff complains against defendant and for a third claim for relief alleges:

38.   The Fifth Amendment to the United States Constitution provides, in part that "No person shall be ... deprived of life, liberty, or property, without due process of law; nor shall private property be taken for public use, without just compensation." U.S. Const. Amend. V.

39.   It is well settled law that where Congress, by treaty or other agreement, has declared that Indians are to hold certain property permanently, compensation must be paid for subsequent takings. *United States v. Sioux Nation of Indians*, 100 S. Ct. 2716, 448 U.S. 371 (1980); *Tee-Hit-Ton Indians v. United States*, 75 S. Ct. 313, 348 U.S. 272, *reh'g denied* 75 S. Ct. 521, 348 U.S. 965 (1955); *United States v. City of Pawhuska*, 502 F.2d 821 (10th Cir. 1974). 5 U.S.C. § 706 provides in relevant part that in a challenge to agency action "The reviewing court shall ... (2) hold unlawful and set aside agency action, findings, and conclusions found to be ... (B) contrary to constitutional right, power, privilege, or immunity ... ."

11

40. Some of the plaintiffs have been denied the right to participate in the Osage tribal government, and have been denied the right to participate in distributions from the Osage mineral estate because the Defendants have allowed Osage headrights – or Mineral Allotments – to pass into the ownership of persons and entities that are not of Osage blood. The Defendant's failure to properly manage the Tribe's trust assets, accounts and funds, coupled with Defendants' inability to keep Osage headrights from passing into the hands of those who are not of Osage blood, constitutes a deprivation of the Tribe's property by Interior and its sub-agencies in violation of the Fifth Amendment of the United States Constitution.

## FOURTH COUNT
## ADMINISTRATIVE ACTION NOT IN ACCORDANCE WITH LAW AND SHORT OF THE PLAINTIFFS' CONSTITUTIONAL RIGHTS

41. Paragraphs 1 through 40 are incorporated by reference.

42. Plaintiff complains against defendant and for a third claim for relief alleges:

43. 5 U.S.C. § 706 provides in relevant part that in a challenge to agency action "The reviewing court shall ... (2) hold unlawful and set aside agency action, findings, and conclusions found to be ... (A) ... otherwise not in accordance with law; ... [or] (B) contrary to constitutional right, power, privilege, or immunity ...."

44. A set forth above, the Defendants' regulations, 25 C.F.R. pt. 90 violate the Plaintiffs' Constitutional right to participate in their government, and violate the Defendants' trust responsibility to the Plaintiffs. As such, the Defendants' regulations relating to the Osage Tribal elections should be held to be illegal agency action under 5 U.S.C. § 706.

## **RELIEF REQUESTED**

Wherefore, Plaintiff requests the following relief:

1. On Plaintiff's first claim for relief, an order from this Court holding that 25 U.S.C. pt. 90 violates the Plaintiffs' Constitutional rights of political association, and their right to be free from the unequal application of the laws, and that 25 U.S.C. pt. 90 is therefor invalid.

2. On Plaintiff's second claim for relief, an order from this Court holding that the Defendants have breached their trust responsibility to the Plaintiffs by restricting their right to participate in the Osage Tribal elections, and by allowing Osage "headrights" to be alienated from those of Osage blood.

3. On Plaintiff's third claim for relief, an order from this Court holding that the Defendants have unconstitutionally taken the Plaintiffs' property interest in Osage headrights by allowing them to be alienated to persons without Osage blood, causing the Plaintiffs to lose the opportunity to participate in their government, and causing the Plaintiffs to lose the financial benefit of those lost headrights.

4. On Plaintiff's fourth claim for relief, an order from this Court holding that the Defendants' regulations, 25 C.F.R. pt. 900 are illegal agency action because these regulations violate the Plaintiffs' Constitutional rights of political association and the right to be free from the unequal application of the law.

5. An order from this Court directing the Defendants to pay the Plaintiffs attorney fees and costs under the Equal Access to Justice Act, 28 U.S.C.A. § 2412.

6. On all of Plaintiff's claims for relief, such other relief as this Court deems necessary and equitable.

Respectfully submitted,

_____
Jason B. Aamodt, Esq., Okla. Bar No. 16974
The McCorkell Center
1718 South Cheyenne Avenue
Tulsa, Oklahoma 74119
(918) 583-6100

*Attorney for Plaintiffs*

Friday, May 31, 2002.