IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA

| | |
|---|---|
| WILLIAM S. FLETCHER, *et al.*, ) | |
| ) | |
| Plaintiffs, ) | |
| ) | |
| v. ) | Case No. 02-CV-427-GKF-FHM |
| ) | |
| THE UNITED STATES OF AMERICA, ) | |
| *et al.*, ) | |
| ) | |
| Defendants. ) | |

**OPINION AND ORDER**

This matter comes before the court on the Motion to Dismiss (Dkt. #995) of defendant Ben T. Benedum ("Benedum"). Benedum contends the plaintiffs' Third Amended Complaint fails to state a claim upon which relief can be granted. Benedum is one of approximately 1,700 individuals named as defendants (collectively, the "Individual Defendants") in the Third Amended Complaint.

**I. Background and Procedural History**

In 1872, Congress established a reservation of approximately one and a half million acres for the Osage Tribe of Indians in north central Indian Territory. *See* Act of June 5, 1872, ch. 310, 17 Stat. 228 (An Act to Confirm to the Great and Little Osage Indians a Reservation in the Indian Territory). The first oil and gas lease of the reservation was made in 1896, followed by substantial discoveries of oil and gas in 1904 and 1905. COHEN'S HANDBOOK OF FEDERAL INDIAN LAW § 4.07[1][d][ii] (2005 ed.). "The Osage Nation quickly accumulated a large tribal trust fund in the Treasury from oil and gas leases, sales of townsite lots, permit taxes, and sale of an earlier tribal reservation in Kansas." *Id.* (citing *McCurdy v. U.S.*, 246 U.S. 263 (1918)). Tribal wealth made the Osages targets of various forms of fraud and overreaching. *Id.*

In 1906, Congress passed the Osage Allotment Act in an attempt to individualize much of the Osage tribal property and to provide some protection for tribal members. *See* Act of June 28, 1906, ch. 3572, 34 Stat. 539 (An Act for the Division of the Lands and Funds of the Osage Indians in Oklahoma Territory and for Other Purposes) (the "1906 Act"). The 1906 Act directed the preparation of a tribal membership roll. The tribal roll was limited to persons whose names were on the roll maintained by the United States Indian agent at the Osage Agency, as it existed on January 1, 1906, and their children born by July 1, 1907. *See* 1906 Act, § 1. Each individual on the final roll received an interest in the tribal mineral estate. The tribal mineral estate underlying the former reservation was severed and placed in trust. The mineral income was to be paid per capita on a quarterly basis to the 2,229 persons on the authorized tribal roll or their heirs. *See* 1906 Act, § 4. The right to participate in these quarterly distributions is called a "headright."[1] The trust period was originally set at twenty-five years, but was extended several times. In 1978, Congress extended the tribal trust "in perpetuity." *See* Pub. L. No. 95-496, § 2(a), 92 Stat. 1660 (1978) (the "1978 Act").

The plaintiffs in this case are Osage Indians and are descendants of individuals listed on the tribal rolls at the time of the Osage Allotment Act. Plaintiffs assert three claims for relief in their Third Amended Complaint. First, they allege that the United States, the Department of the Interior, the Secretary of the Interior, the Bureau of Indian Affairs, and the Assistant Secretary of the Interior for Indian Affairs (collectively, the "Federal Defendants") have breached their trust obligations by improperly distributing trust assets in violation of the 1906 Act, and by failing to account to the

---

[1] A headright is statutorily defined as "any right of any person to share in any royalties, rents, sales, or bonuses arising from the Osage mineral estate." Pub.L. No. 98-605, § 11(2), 98 Stat. 3163 (the "1984 Act"); *Shelton's Estate v. Okla. Tax Comm'n*, 544 P.2d 495, 497 (10th Cir. 1975) ("headrights are interests in unaccrued royalties arising from mineral interests.").

2

plaintiffs for all funds held in trust, including the headright payments. Second, plaintiffs allege the Federal Defendants' failure to properly manage the trust assets constitutes a deprivation of plaintiffs' property in violation of the Fifth Amendment. Third, the plaintiffs allege the Federal Defendants took administrative actions not in accordance with the law by making headright payments to improper persons in violation of the law and by refusing to provide plaintiffs with an accounting.

Plaintiffs initially filed this action against the Federal Defendants only. The 1,700 Individual Defendants, including Benedum, were added after the Federal Defendants persuaded the court that the non-Osage headright owners were required parties to this action. The court determined they were required parties because plaintiffs sought to strip them of the right to receive quarterly distribution of Osage trust income.[2] Opinion and Order, Doc. No. 79, p. 7.

## II. Applicable Legal Standards

The plaintiffs' complaint must make "a short and plain statement of the claim showing that the pleader is entitled to relief." Fed.R.Civ.P. 8(a)(2). "Factual allegations must be enough to raise a right to relief above the speculative level." *Bell Atlantic Corp. v. Twombly*, 550 U.S. 544, 555 (2007) (citing 5 C. Wright & A. Miller, Federal Practice and Procedure § 1216, pp. 235-236 (3d ed. 2004)). Federal pleading standards require "only enough facts to state a claim to relief that is plausible on its face." *Id.* at 570. If Plaintiffs do not nudge their claims across the

---

[2] Plaintiffs alleged in their First Amended Complaint that quarterly headright payments cannot legally be made to persons who are not Osage Indians, or "heirs" of Osage Indians "confined narrowly to Osage Indians, their spouses, and Indians by blood." First Amended Complaint, ¶¶ 13-35.

3

line from conceivable to plausible, their complaint must be dismissed. *Id.*[3] This Court must look to the specific allegations in the Third Amended Complaint to determine whether they plausibly support a legal claim to relief against Benedum. *Alvarado v. KOB-TV, L.L.C.*, 493 F.3d 1210, 1215 n.2 (10th Cir. 2007).

The canons of statutory construction favoring Indians generally "provide for a broad construction when the issue is whether Indian rights are reserved or established, and for a narrow construction when Indian rights are to be abrogated or limited." *N.L.R.B. v. Pueblo of San Juan*, 276 F.3d 1186, 1194 (10th Cir. 2002) (citations omitted). "[T]he canon requiring resolution of ambiguities in favor of Indians is to be given the 'broadest possible scope,' remembering that '[a] canon of construction is not a license to disregard clear expressions of ... congressional intent.'" *Id.* (citing *DeCoteau v. Dist. Cnty. Court*, 420 U.S. 425, 447 (1975)).

### III. The Motion to Dismiss

Benedum relies in part on materials outside the pleadings, including a letter attached to his reply brief, and a factual reference to how he inherited his beneficial headright interest. When evidence outside the pleadings are submitted with a motion to dismiss, the court may exclude the additional material and decide the motion on the complaint alone. *See* Fed.R.Civ.P. 12(d); *Cuccolo v. Lipsky, Goodkin & Co.*, 826 F.Supp. 763, 766-67 (S.D.N.Y. 1993). The court hereby excludes all matters outside the pleadings in consideration of Benedum's Motion to Dismiss, and therefore need not treat the motion as one for summary judgment under Rule 56.

---

[3] Plaintiffs erroneously urge the court to apply the now-defunct "no set of facts" pleading standard of *Conley v. Gibson*, 355 U.S. 41, 45-46 (1957). The "no set of facts" language "is best forgotten as an incomplete, negative gloss on an accepted pleading standard: once a claim has been stated adequately, it may be supported by showing any set of facts consistent with the allegations in the complaint." *Twombly*, 550 U.S. at 563 (citations omitted).

Benedum argues he should be dismissed because non-Indians who own a beneficial interest in a headright may legally receive quarterly payments from the Osage mineral estate, and because plaintiffs have failed to allege sufficient facts to state a claim that he is not legally entitled to receive those quarterly payments. Plaintiffs argue that a non-Indian such as Benedum cannot "hold legal or equitable title to an Indian trust asset *while such asset remains in trust for the benefit of the Osage Tribe*." (Plaintiffs' Response Brief, p. 7) (emphasis in original).

In dealing with an Indian question such as this, "it must be remembered that the powers of Congress are plenary." *Taylor v. Tayrien*, 51 F.2d 884, 887 (10th Cir. 1931). "Congress has never relinquished control of Indian headrights, and the sale, encumbrance or alienation thereof is only authorized pursuant to acts of Congress. Thus any right of an heir or legatee to share in the corpus is dependent upon the wishes of Congress." *In the Matter of the Estate of Tayrien*, 609 P.2d 752, 755 (Okla. 1980).

The leading commentary on Federal Indian Law has long recognized that some headrights are owned by non-Osages as a result of succession by inheritance and devise:

> Most persons of Osage Indian ancestry own no headrights, and thus receive no tribal income. Some persons own more than one headright, or own fractional shares of headrights, *and some headrights are owned by non-Osages*. ... This is a result of succession to headrights by inheritance and devise." ... Succession [to headrights] by non-Indians is now severely limited [*see* Pub. L. No. 95-496, § 5(c), 92 Stat. 1660 (1978)], but during earlier periods there were fewer restrictions. ... Because of tribal wealth, many non-Indians sought to marry Osages prior to the imposition of restrictions on succession.

F. COHEN, HANDBOOK OF FEDERAL INDIAN LAW (1982 ed.), p. 791, and at n.196 (emphasis added). Congress has always permitted some non-Indians to own headrights. For example, under the 1906 Act, Congress permitted a headright to be passed to an intestate Osage's heirs at law, whether or not

the heirs were Indian. 1906 Act, § 6, 34 Stat. 539; COHEN (1982 ed.) at n.202. In the Act of April 18, 1912, 37 Stat. 86-87 (the "1912 Act"), Congress explicitly allowed Osage Indians to dispose of their headrights by will, and did not restrict them from devising the headright to a non-Indian. *In the Matter of the Estate of Little Bear*, 909 P.2d 42, 47-48 (Okla. 1995) (citing Section 8 of the 1912 Act).

The Act of April 12, 1924, 43 Stat. 94 (the "1924 Act") explicitly recognized the rights of non-Indians to own headrights. It provided that Osage headrights which are "vested in, determined, or adjudged to be the right or property of any person not an Indian by blood, may with the approval of the Secretary of the Interior and not otherwise be sold, assigned, and transferred under such rules and regulations as the Secretary of the Interior may prescribe." Thus, the 1924 Act explicitly allowed *inter vivos* transfer of headright interests by non-Indians. *In re Irwin*, 60 F.2d 495, 496 (10th Cir. 1932); *Estate of Little Bear* at 48.

Soon thereafter, in the Act of February 27, 1925, 43 Stat. 1008 (the "1925 Act"), Congress restricted "inheritance by non-Indians where the decedent owning the headright was one-half or more Osage Indian blood." *Estate of Little Bear.* at 48. "Judicial interpretation of the 1925 Act made clear the provision applied to intestate succession only and did not control passage of Osage held property under a valid will." *Id.* at 47-48 (citing *In re Thompson's Estate*, 65 P.3d 442, 447 (Okla. 1937), *cert. denied*, 302 U.S. 718 (1937)). Thus, the 1925 Act did not restrict passage of an Osage-held headright by will to a non-Indian.

In 1931, the Tenth Circuit noted that Congress had freed headrights in the hands of non-Indians from restrictions on alienation. *Taylor*, 51 F.2d at 890. Non-Indians could therefore obtain headright interests by purchase or inheritance from other non-Indians.

6

The 1978 Act significantly restricted the alienation of Osage headrights, and superseded all earlier provisions. COHEN (2005 ed.) § 4.07[1][d][ii]. Prior to 1978, an Osage will, if approved by the Secretary of the Interior, could devise the testator's full interest in a headright to a non-Indian. *See* Act of Apr. 18, 1912, § 8; COHEN (2005 ed.) § 4.07[1][d][ii] at n.878. Under the 1978 Act, headrights owned by non-Indians may be alienated, but only upon approval of the Secretary and subject to the preferential right of the Osage Nation to purchase them. 1978 Act, § 8(a), *as amended by* the Osage Tribe of Indians Technical Corrections Act of 1984, Pub.L. No. 98-605, 98 Stat. 3163 (the "1984 Act"); COHEN (2005 ed.) § 4.07[1][d][ii] at n.874. Before 1978, alienation required only the Secretary's approval. 1924 Act; COHEN (2005 ed.) § 4.07[1][d][ii] at n.874. Following enactment of the 1984 Act, the Secretary of the Interior has the authority to modify an Osage will so that a non-Osage devisee receives only a life estate. *Crawley v. United States*, 977 F.2d 1409, 1410-1411 (10th Cir. 1992).

Even after the 1984 Act, some non-Indians may own and devise full beneficial headright interests. In *Estate of Little Bear*, the Oklahoma Supreme Court found "no Congressional intent in the 1984 Act to prohibit a non-Indian from receiving more than a life estate when a headright interest involved is being devised by the will of a non-Indian . . . who lawfully owned the full beneficial interest in the headright at the time of death, having acquired such interest long prior to passage of either the 1978 or 1984 Acts." *Estate of Little Bear* at 59.

Whether a non-Indian may only own a life estate or may own a full beneficial headright interest is not important to the inquiry now before this court. The point of the preceeding recitation of the Osage Allotment Act and its various amendments is that Congress has explicitly authorized

7

non-Indian ownership of headright interests. Plaintiffs are simply mistaken as a matter of law when they contend a non-Indian cannot hold legal or equitable title to a headright.

As previously mentioned, plaintiffs frame the issue presented as "whether a non-Indian such as Benedum can hold legal or equitable title to an Indian trust asset *while such asset remains in trust for the benefit of the Osage Tribe.*" Although the Osage mineral estate was placed "in trust for the tribe," *Osage Nation v. Irby*, 597 F.3d 1117, 1120 (10th Cir. 2010), Congress has possessed and exercised plenary power over the sale, encumbrance and alienation of headrights since 1906. Any and all right, title and interest in headrights is dependent on the Acts of Congress. *In the Matter of the Estate of Tayrien*, 609 P.2d at 755. The courts may not override or circumvent Congressional plenary power in this area. Congress chose to administer the Osage mineral estate by assigning headrights to those Osage listed on the 1906 membership roll. The Tenth Circuit has observed "That the title to the minerals is in the tribe does not bear against the conclusion that the right of individuals to participate in the income therefrom is a property right." *Irwin*, 60 F.2d at 497. Because headrights were property rights owned by the individuals on the 1906 tribal roll, they passed in some cases by inheritance and devise. *See Little Bear*, 909 P.2d at 45. In some cases, this meant that a non-Osage would inherit a headright interest. *Id.* As set forth above, Congress explicitly acknowledged in the 1924 Act that non-Indians could own headrights. This court therefore concludes as a matter of law that a non-Indian such as Benedum can hold legal or equitable title to a headright despite the Osage mineral estate having been placed in trust for the tribe.

Plaintiffs also contend:

> "Benedum's Motion does nothing to address whether he in fact could
> be entitled to receive some of the Segregated Funds. As with all of
> the Defendants, the Plaintiffs offered to Benedum the opportunity to

8

> demonstrate that he is entitled by law to receive payments from the Segregated Fund, and the Plaintiffs would voluntarily dismiss him."

(Dkt. # 1052, p.14). Plaintiffs have the burden of pleading reversed. It is *plaintiffs'* burden to plead "[f]actual allegations [sufficient] to raise a right to relief above the speculative level." *Twombly*, 550 U.S. at 555. It is not Benedum's obligation to prove to plaintiffs that he is entitled to a headright interest. Plaintiffs have merely alleged a speculative claim – that perhaps, after an accounting has been completed, plaintiffs will be able to show that Benedum is not entitled to his headright interest. Plaintiffs concede as much in their response: "[t]he fact that the Court cannot know – absent an accounting – whether Benedum's receipt of Segregated Funds is illegal is why the Plaintiffs make no specific allegations against Benedum." (Dkt. # 1052 at p.19). If Benedum's receipt of quarterly headright distributions is illegal, it is the plaintiffs' burden to allege a plausible claim to raise their right to relief above the speculative level. They have not done so. Benedum's motion to dismiss is granted.

This court previously held that non-Osage headright owners were "required parties" to this action. It did so in light of plaintiffs' claim that the Osage Allotment Act does not permit non-Osage the right to receive quarterly income payments from the Osage mineral estate. Insofar as the court has now rejected that overarching legal argument, and insofar as plaintiffs have now admitted that the court cannot know – absent an accounting by the Federal Defendants – if Benedum's receipt of headright payments is illegal, it is now clear that Benedum is not presently a "required party." It is highly speculative at this juncture that plaintiffs might at some future date be able to state a claim upon which Benedum's headright interest could be terminated. It has also become clear that, due to the highly individualized nature of the hundreds of proceedings necessary to determine whether

9

the individual non-Osage headright owners' right to receive headright payments should be terminated (as plaintiffs request), the court will need to revisit the joinder issue soon.

## IV. Conclusion

For the reasons set forth above, Benedum's Motion to Dismiss (Dkt. #995) is granted. Further, the court supercedes its previous Opinion and Order (Dkt. #79) and holds that Benedum is no longer a required party pursuant to Rule 19.

IT IS SO ORDERED this 31st day of March, 2011.

Gregory K. Frizzell
United States District Judge
Northern District of Oklahoma