**IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA**

| | | |
|---|---|---|
| WILLIAM S. FLETCHER, *et al.*, | ) | |
| | ) | |
| Plaintiffs, | ) | |
| | ) | |
| v. | ) | Case No. 02-CV-427-GKF-PJC |
| | ) | |
| THE UNITED STATES OF AMERICA, *et al.*, | ) | |
| | ) | |
| Defendants. | ) | |

**OPINION AND ORDER**

In the early twentieth century, large quantities of oil and gas were discovered on lands belonging to the Osage Nation.  Shortly thereafter, Congress enacted the Osage Allotment Act of 1906, *see* Act of June 28, 1906, Pub. L. No. 59–321, 34 Stat. 539 ("Osage Allotment Act" or "1906 Act"), which severed the mineral estate underlying Osage lands from the surface estate, placed the mineral estate in trust, and directed the Secretary of Interior to collect and distribute royalty income every quarter to persons on the 1906 tribal membership roll.  The right to receive such royalty payments is called a "headright."

The sole remaining claim in this long-running case concerns the federal government's duty to account to individual Osage headright owners.  Certified as a class in 2014, plaintiffs are Osage Indians who receive headright payments pursuant to the 1906 Act.  They brought this claim pursuant to the Administrative Procedure Act ("APA"), 5 U.S.C. § 701 *et seq*., against the United States of America, the Department of Interior, Sally Jewell in her official capacity as Secretary of the Interior, the Bureau of Indian Affairs, and Kevin Washburn in his official capacity as Assistant Secretary of the Interior–Indian Affairs (collectively, "the government"), seeking an accounting of tribal trust funds held on their behalf.  In particular, plaintiffs request an accounting of the Osage tribal trust account—an account within the United States Treasury

which holds Osage royalty income prior to its distribution to the headright owners.  In response,
the government maintains that the account at issue is held in trust for the Osage Nation only and
that, as such, plaintiffs are not entitled to the accounting they seek.  For the reasons stated in this
Opinion and Order, the court holds that the plaintiffs are entitled to accounting of the Osage
tribal trust account in accordance with the requirements set forth herein.

## I.   Background

"In 1872, Congress established a reservation for the Osage Nation in present day
Oklahoma." *Osage Nation v. Irby*, 597 F.3d 1117, 1120 (10th Cir. 2010) (citing Act of June 5,
1872, ch. 310, 17 Stat. 228).  In 1904 and 1905, large quantities of oil and gas were discovered
on the reservation.  *See* Cohen's Handbook of Federal Indian Law § 4.07[1][d][ii], at 311 (Neal
Jessup et al., eds., 2005) [hereinafter, "Cohen's Handbook"].  To manage the Osages' newfound
wealth, Congress enacted the Osage Allotment Act which, as previously mentioned, placed the
mineral estate underlying Osage lands in trust, directed the Secretary of Interior to collect royalty
income, and required the Secretary to distribute such income (with interest) to tribal members on
a quarterly, pro rata basis.  *See* 1906 Act, § 4.[1]  The government's trusteeship over the Osage

_____

[1]  Section 4 of the 1906 Act reads in relevant part as follows:

> [A]ll funds belonging to the Osage tribe, and all moneys due, and all moneys that
> may become due, or may hereafter be found to be due the said Osage tribe of Indians,
> shall be held in trust by the United States ….
>
> [A]ll the funds of the Osage tribe of Indians, and all the moneys now due or that may
> hereafter be found to be due to the said Osage tribe of Indians … shall be segregated as
> soon after January first, nineteen hundred and seven, as is practicable and placed to the
> credit of the individual members of the said Osage tribe on a basis of a pro rata division
> among the members of said tribe….
>
> [T]he royalty received from oil, gas, coal, and other mineral leases upon [Osage]
> lands … shall be placed in the Treasury of the United States to the credit of the members
> of the Osage tribe of Indians as other moneys of said tribe are to be deposited under the
> provisions of this Act, and the same shall be distributed to the individual members of said

mineral estate was originally set to last twenty-five years, *see* 1906 Act §§ 3, 4, but has since been extended "in perpetuity," *see* Pub. L. No. 95-496, § 2(a), 92 Stat. 1660 (1978).

As previously mentioned, the right to receive quarterly trust distributions is referred to as a "headright." *Taylor v. Tayrien*, 51 F.2d 884, 886 (10th Cir. 1931). Under the 1906 Act, there are 2,229 headrights—one for each person on the 1906 tribal membership roll. *See Big Eagle v. United States*, 300 F.2d 765, 765 (Ct. Cl. 1962); *see also* 1906 Act §§ 1, 4. Today, "[m]ost persons of Osage Indian ancestry own no headrights, and thus receive no tribal income. Some persons own more than one headright, or own fractional shares of headrights, and some headrights are owned by non-Osages." Cohen's Handbook, *supra*, at 313. "This fractionalization is a result of succession to headrights by inheritance and devise. Succession by non-Indians is now severely limited, but during earlier periods there were fewer restrictions." *Id.* at 313 n.873 (citation omitted).

Prior to distribution, royalty income collected under the 1906 Act is held in a U.S. Treasury account, titled the Osage tribal trust account. The tribal trust account "was established by the 1906 Act," *Osage Tribe of Indians of Okla. v. United States*, 81 Fed. Cl. 340, 348 (2008), and is the means by which the government carries out its duties to collect, hold, and distribute funds pursuant thereto, [*see* Dkt. #1212-1, Administrative Record, p. 2]. Although some distributions from this account are made by direct check to headright owners, the vast majority are done via transfers to Individual Indian Money ("IIM") accounts. An IIM account is "an

_____

Osage tribe…in the manner and at the same time that payments are made of interest on other moneys held in trust for the Osage by the United States….

The Act diverts a small portion of royalty income to the Osage Nation, but provides that "all else [be] 'placed ... to the credit' of headright owners and distributed to them personally." *Fletcher v. United States*, 730 F.3d 1206, 1209 (10th Cir. 2013) (second alteration in original) (citing 1906 Act, § 4(3)–(4)).

interest bearing account for trust funds held by the Secretary that belong to a person who has an interest in trust assets." 25 C.F.R. § 115.002.  Unless restricted in some way, an account holder may freely withdraw funds from his or her IIM account.  *See id.*

## II.    Procedural History

This case has a long and complicated history.  Originally filed in 2002 as a dispute over the tribal voting rights of non-headright-owning Osage Indians [*see* Dkt. #1, p. 6], the case later evolved into an action over the government's allegedly wrongful distribution of Osage royalty income to non-Osages and its failure to account to the headright owners, [*see* Dkt. #985-1, pp. 27-31, 33].  Today, however, plaintiffs' only remaining claim is their request for an accounting.

Plaintiffs first asserted their accounting claim in 2006, as part of their First Amended Complaint.  [*See* Dkt. #24, pp. 9, 11].  In May 2011, after litigating issues related to plaintiffs' other causes of action, the government moved to dismiss this claim along with, what was then, the plaintiffs' Third Amended Complaint.[2]  [Dkt. #1126].  As to the accounting claim, the government argued that dismissal was warranted because (1) there was no trust relationship between the federal government and headright owners and (2) the statutes on which plaintiffs relied did not afford them the right to an accounting.  [*Id.* at 8-12].

This court rejected the government's first argument, but accepted its second.  As an initial matter, the court concluded that the 1906 Act created a limited trust relationship between the federal government and the Osage headright owners but that this relationship "differ[ed] from the trust relationship between the federal government and the Osage Nation."  [Dkt. #1162, p. 10

_____

[2]   For a description of the procedural history of this case between the filing of plaintiff's First Amended Complaint and the government's Motion to Dismiss the plaintiffs' Third Amended Complaint, see this court's Opinion and Order, dated March 31, 2012,  [Dkt. #1162, pp. 1-4].

n.6].  Specifically, the court determined that the government's trust relationship with the Osage

headright owners only took effect upon distribution and that, prior to distribution, royalty funds

were held in trust for the Osage Nation only.  [*See id.* at 10 n.6, 11, 13].  Based on this limited

trust relationship, the court held that plaintiffs could not seek an accounting:

> To establish that an agency was required to provide the plaintiffs with an accounting, plaintiffs must "identify a legal obligation imposed on Defendants to account for the funds held in trust."  *Otoe-Missouria Tribe of Oklahoma v. Kempthorne*, 2008 WL 5205191, *2 (W.D. Okla. 2008).
>
> In the Third Amended Complaint, plaintiffs allege they are entitled to an accounting pursuant to 25 U.S.C. §§ 162a and 4011. [Dkt. #985-1, p.26, ¶ 46].  By its explicit terms, Section 162a(a) applies "to the funds of the Osage Tribe of Indians, and the individual members thereof, only with respect to the deposit of such funds in banks."  None of the failures to account alleged by plaintiffs relate to the *deposit* of funds in banks.  Rather, the alleged failures to properly manage and account for monies relate to *distributions* from the Osage Mineral Estate, not deposits.…
>
> Similarly, Section 4011 imposes a requirement to account only for funds "deposited or invested pursuant to section 162a."  No such funds are implicated in this lawsuit.  Plaintiffs' allegations of mismanagement focus on distributions.  Section 4011 does not impose an obligation upon the Federal Defendants to account to the plaintiffs.
>
> Insofar as plaintiffs allege in Paragraph 59 of the Third Amended Complaint that the Federal Defendants bear certain accounting and administrative responsibilities pursuant to Section 4 of the 1906 Act and Section 162a(d), the Court addresses those alleged responsibilities.  Due to the nature of the trust relationship between the federal government and headright owners, plaintiffs' demands for an accounting or audit are misplaced.  Headright owners receive quarterly payments in proportion to their fractional ownership of headrights.  Plaintiffs do not allege the headright payment amounts have ever been miscalculated (as opposed to their claims that the headrights have been passed to improper individuals).  Unlike the trust account held for the Osage tribe, there is no underlying trust account with a balance for headright owners to examine.  Because headright owners do not have headright "accounts," it is impossible for the Government to give them access to a daily balance of an account.  Headright owners are simply paid a percentage of the funds from the tribal trust account at the end of each quarter.  As previously discussed, the more complex trust responsibilities such as collecting royalty payments, investing proceeds, collecting interest, and calculating disbursement amounts are all part of the federal government's trust relationship with the Osage Nation, not with the individual headright owners.  [*Osage Nation v. United States*, 57 Fed. Cl. 392, 395 (2003)].  Simply put, the accounting obligations set forth in Section 162a(d) (e.g. trust fund balances, timely reconciliations, accurate cash balances, periodic statements to

account holders of account performance) have no application to the unique relationship between the federal government and headright owners.

[*Id.* at 12-14 (footnotes omitted)].

On appeal, the Tenth Circuit reversed. It agreed with this court's holding that the 1906 Act creates a trust relationship between the federal government and the individual Osage headright owners but rejected this court's determination that plaintiffs could not seek an accounting under 25 U.S.C. § 4011(a):

> By its plain language [§ 4011(a)] appears to impose on the federal government a duty to "account for"—to render a reckoning, answer for, explain or justify, *see* 1 *The Oxford English Dictionary* 85 (2d ed.1989)—the daily and annual balances of money it holds in trust.  Of course, the government must account, answer or explain itself to *someone,* and the plain language of the statute seems to tell us who: to the tribe when the funds are held "for [its] benefit," and to individual tribal members when the funds are held "for [their] benefit."  As we've seen, the trust funds at issue in this case—collected and disbursed under the terms of the 1906 Act—are being held for the benefit of individual members of the Osage Nation.  So it would seem that—in our case at least—Congress has chosen to afford individual tribal members the statutory right to seek and obtain an accounting, just as plaintiffs contend.

*Fletcher v. United States*, 730 F.3d 1206, 1209–10 (10th Cir. 2013) (hereinafter, *Fletcher II*) (alternation in original) (emphasis in original).

The court of appeals rejected this court's interpretation of § 4011(a) as limiting the government's accounting responsibilities to funds which are deposited or invested.  "[Section] 162a(a) through (c)," the court explained, "speak to the Secretary's investment options, not to the nature of scope of the Secretary's accounting obligations."  *Id.* at 1212.  In other words, nothing in § 162a limits the Secretary's fiduciary obligations to the Osage headright owners, "let alone circumscribe[s] the accounting promised by § 4011(a)."  *Id.* at 1211.  The court stressed that its understanding of the statute was informed not only by its text and structure, but also by its overarching purpose:

Under the district court's reading, the government's accounting obligations extend only to trust fund deposits but *not* withdrawals.  The Secretary has to account to headright owners for what goes into their trust fund, but not what comes out. But what could possibly be the point of that?  Half of an accounting may be closer to no accounting at all—an assurance deposits are properly handled seems pretty nearly pointless without a corresponding assurance disbursements are too.…We can well imagine Congress choosing either to grant or deny the right to request an accounting, but no one has advanced any reason why it might adopt an almost useless halfway measure for tribes and individual tribal members alike.

*Id.* at 1212–13.

Although not an issue on appeal, the circuit court's opinion did offer guidance as to what the government must do to discharge its accounting duty.  It emphasized that this court has "considerable discretion to mould the nature and scope of the accounting" that is due and that the court "must seek to balance … considerations of completeness and transparency on the one hand, and speed, practicality, and cost, on the other."  *Id.* at 1214 (internal quotation marks omitted). The court of appeals concluded by noting the possibility that the government could discharge its accounting duty by providing the headright owners with the same accounting it had provided the tribe.  *See id.* at 1215-16 ("It may very well be within the district court's considerable discretion simply to order the government to share with the plaintiffs something like it has already shared with the Nation.").[3]

On remand, the government submitted an administrative record containing, among other documents, statements from the IIM accounts for plaintiffs William Fletcher and Charles Pratt from 2006 to 2013 as well as redacted monthly statements of the Osage tribal trust account for

---

[3]   Although the government previously told the Tenth Circuit that it had provided the Osage Nation with an accounting, [*see* Dkt. #1219-3, Tenth Circuit Oral Argument Transcript, pp. 24, 29], the government has since acknowledged that it neither produced nor provided such an accounting as part of its settlement with the Nation, [*see* Dkt. #1279, Oct. 2015 Hearing Transcript, p. 45].

that same period.  Since the Tenth Circuit's remand, the court has received two rounds of briefing on the scope of the government's accounting duty and, on October 23, 2015, held its final hearing on the merits.

## III.     Discussion

As previously mentioned, plaintiffs brought this case pursuant to the APA.  "Under the APA, [this court] cannot set aside an agency decision unless it fails to meet statutory, procedural or constitutional requirements, or unless it is arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law."  *Sac & Fox Nation of Missouri v. Norton*, 240 F.3d 1250, 1260 (10th Cir. 2001).

The parties' briefs raise three issues for consideration.  First, the parties disagree over whether the plaintiffs are entitled to an accounting of the Osage tribal trust account (as plaintiffs contend) or are limited to an accounting of their respective IIM accounts (as the government contends).  Second, assuming plaintiffs are entitled to an accounting of the tribal trust account, the government submits that the Osage Nation waived the headright owners' rights to seek such an accounting based on the tribe's settlement agreement with the federal government in the Court of Federal Claims.  Finally, assuming that plaintiffs are not barred from seeking an accounting, the court must determine the scope of the accounting that is due.  The court addresses these issues in turn.

### A.   *Determining the Relevant Account*

*Fletcher II* clearly dictates that plaintiffs are entitled to an accounting.  On remand, the parties disagree over whether this means an accounting of the Osage tribal trust account or the plaintiffs' respective IIM accounts.  For their part, plaintiffs request an accounting of the tribal trust account which, they contend, holds funds on their behalf pursuant to the 1906 Act.  The

government disputes this assertion.  It contends that funds while in the tribal trust account are held in trust solely for the Osage Nation and that it is only upon distribution that those funds are held for the benefit of the headright owners.  Consequently, in the government's view, only the Osage Nation may seek an accounting of the tribal trust account, whereas plaintiffs are merely entitled to an accounting of their respective IIM accounts.

Although the Tenth Circuit's opinion does not specifically address this issue, its analysis suggests a clear result.  "[T]he 1906 Act creates a trust relationship running directly between the government and individual Osage headright owners…." *Fletcher II*, 730 F.3d at 1213.  The plaintiffs' right to an accounting arises from the application of 25 U.S.C. § 4011(a) to this trust relationship.[4]  *See id.* at 1209-10, 1213.  Under § 4011(a), the government must account "to the tribe when … funds are held for its benefit and to the individual tribal members when … funds are held for their benefit."  *Id.* at 1209 (alterations omitted) (internal quotation marks omitted).  As the court's opinion makes clear, funds "collected and disbursed under the terms of the 1906 Act…are … held for the benefit of individual members of the Osage Nation."  *Id.* at 1209-10.  Put differently, "the 1906 Act requires the Secretary to hold Osage mineral wealth in trust for *individual* Osage headright owners."  *Id.* at 1213 (emphasis in original).  Accordingly, under § 4011(a), plaintiffs are entitled to an accounting of funds "collected and disbursed under the terms of the 1906 Act."  *See id.* at 1209-10.

---

[4]  Section 4011(a) reads, "The Secretary [of the Interior] shall account for the daily and annual balance of all funds held in trust by the United States for the benefit of an Indian tribe or an individual Indian which are deposited or invested pursuant to section 162a of this title."  25 U.S.C. § 4011(a).

The Osage tribal trust account fits this description.[5]  The tribal trust account "was established by the 1906 Act," *Osage Tribe*, 81 Fed. Cl. at 348, and is the means by which the government carries out its duties to collect, hold, and distribute funds pursuant thereto, [*see* Dkt. #1212-1, Administrative Record, p. 2 ("[P]ursuant to the 1906 Act the revenues from the Osage Mineral Estate are … placed in the Osage Tribal Trust Account.…[P]ursuant to the 1906 Act the revenues in the Osage Tribal Trust Account are … distributed to the Headright Holders.")].  No other account exists to carry out these functions.  [*See* Dkt. #1266, Defendants' Brief, p. 7 ("[T]here is just one tribal trust account related to this case, and funds are segregated from this account when they are distributed to the headright holders on a quarterly basis." (internal quotation marks omitted))].  Thus, it necessarily follows that plaintiffs are entitled to an accounting of the tribal trust account.

The government's alternative proposal is unpersuasive.  First, the 1906 Act does not say anything about IIM accounts.  Nothing in the Act contemplates or requires the existence of such an account, nor does the Act impose any management obligations on the government after trust distributions are made.  As just mentioned, plaintiffs' right to an accounting arises from the application of § 4011(a) to the trust relationship created under the 1906 Act.  *See Fletcher II*, 730 F.3d at 1209-10, 1213.  It thus makes little sense to say that this right applies only to accounts having nothing to do with the 1906 Act. [6]

_____

[5]  The Osage tribal trust account holds funds pursuant to 25 U.S.C. § 162a, [*see* Dkt. #1266, Defendants' Brief, p. 19 (agreeing with plaintiffs that the tribal trust account is held under § 162a)]; *see also Osage Tribe of Indians of Okla. v. United States*, 93 Fed. Cl. 1, 26 (2010), and thus is subject to the accounting duty set forth in § 4011(a).

[6]  This conclusion is bolstered by the fact that this case has never been about IIM accounts.  Such accounts only became an issue in this case on remand when the government took the position that the accounting right acknowledged in *Fletcher II* only pertains to the plaintiffs' respective

Second, the government's position here merely revives an argument that the Tenth Circuit has already considered and rejected.  In the government's view, only the Osage Nation may seek an accounting of the tribal trust account because, while in that account, funds are held in trust for the Osage Nation only.  The Tenth Circuit rejected this same argument in *Fletcher II*:

> The government recognizes that the 1906 Act creates a trust relationship running directly between the government and individual Osage headright owners, but it suggests one of the usual fiduciary duties attendant to a typical trust relationship here belongs *only* to someone else (the tribe).  Of course, it's not impossible Congress could have chosen to rearrange normal trust principles in this way, but the government identifies *nothing* in the text or structure of the relevant laws suggesting such a design.  To the contrary, § 4011(a) indicates that the government's accounting duty applies to all funds "held in trust ... for the benefit

_____

IIM accounts.  Plaintiffs, however, have never requested such an accounting.  Rather, they consistently have sought an accounting of funds held and disbursed under the 1906 Act, or, to use the government's words, "an accounting of what every other [headright] recipient receives." [Dkt. #1219-3, Tenth Circuit Oral Argument Transcript, p. 25; *see also* Dkt. #985-1, Third Amended Complaint, p. 33 (requesting an accounting of all distributions from the Osage Mineral Estate made pursuant to § 4 of the 1906 Act)].  Given this procedural history, it seems unlikely that the Tenth Circuit reversed in order to provide plaintiffs with an accounting that they do not want and have never requested.

The government makes much of the fact that plaintiffs previously have disclaimed seeking an accounting of the Osage tribal trust account.  [*See* Dkt. #1221, p. 3-4].  These statements, as the government itself acknowledges, were "driven by Plaintiffs' prior belief that a third type of account existed to which they could seek an accounting," namely, a "segregated fund."  [Dkt. #1266, Defendants' Brief, p. 12].  Plaintiffs' belief was premised on the text of the 1906 Act, which at one point states that royalty income "shall be segregated…and placed to the credit of" tribal members and then, shortly thereafter, states that such funds "shall be distributed" to the tribal members.  1906 Act. § 4(1), (2).  Based on this language, plaintiffs believed that segregation and distribution were separate steps and thus that there was a separate "segregated account" holding royalty income prior to distribution.  It was only after the government's submission of the administrative record and its brief on the merits that it became clear that "'segregation' and 'distribution' occur together such that there is no separate 'segregated: tribal trust account.[']"  [Dkt. #1266, p. 7].

Plaintiffs had no way of knowing this information prior to the government's filings.  Their understanding of how the government manages funds under the 1906 Act was reasonable based on the text of the statute.  Thus, given that plaintiffs have always sought an accounting of funds held and disbursed under the 1906 Act, the court will not deny them that accounting simply because they initially did not understand the arrangement by which those funds are administered or what to call the account at issue.

of an Indian tribe *or an individual Indian.*"  In turn, the 1906 Act requires the Secretary to hold Osage mineral wealth in trust for *individual* Osage headright owners.  Taken together, these provisions suggest a trust relationship and an attendant accounting duty running directly between the government and individual Osage headright owners like the plaintiffs before us.  We cannot detect so much as a whiff suggesting they grant accounting privileges *only* to the tribe….[E]ven if we could somehow conjure up the sort of ambiguity the government seems to assume but never identifies, it would still have to be resolved in the plaintiffs' favor.

*Id.* at 1213 (emphasis in original).  As this analysis makes clear, plaintiffs and the Osage Nation

are entitled to the *same* accounting privileges.  Both derive their accounting rights from the *same*

combination of § 4011(a) and the 1906 Act.  *See id.* at 1209 (noting that the 1906 Act "creates a

trust relationship [both]…between the federal government and the Osage Nation, [as well as] …

between  the federal government and the individual Osage headright owners who are plaintiffs in

this case").  Nothing in these provisions, or the Tenth Circuit's opinion, suggests that plaintiffs

and the tribe stand on a different footing in this regard or that somehow their respective

accounting rights differ.[7]  *See id.* at 1213.  Indeed, the Tenth Circuit held exactly the opposite,

_____

[7]  The government's argument is premised on various decisions from the Court of Federal Claims in *Osage Tribe of Indians v. United States*.  That case involved claims by the Osage Nation against the federal government for mismanaging trust funds held in the Osage tribal trust account.  Specifically, the government now relies on a series of decisions issued during the course of that litigation, holding that the Osage Nation is the *only* direct beneficiary of the tribal trust account.  *See Osage Tribe of Indians of Okla. v. United States*, 85 Fed. Cl. 162, 170–71 (2008) ("[T]he Tribe, not the headright holders, is the direct trust beneficiary.…[The individual headright holders] are not a party to the trust relationship which exists between defendant [United States] and plaintiff [Osage Nation].… [T]he 1906 Act created a trust relationship between plaintiff-Osage Tribe and defendant.  Moreover, the court has specifically found that the trust relationship exists exclusively between the Tribe and defendant." (citations omitted) (internal quotation marks omitted)); *Osage Nation*, 57 Fed. Cl. at 395 (concluding that the "headright holders are not in fact 'the real parties in interest' because the Tribe, not the headright holders, is the direct trust beneficiary"); *Osage Tribe*, 93 Fed. Cl. at 40 ("By definition, Osage tribal funds become individual moneys only *after* segregation and distribution…." (emphasis in original)).

*see id.*, at one point even suggesting that the court could resolve this matter simply by ordering the government to provide plaintiffs with the same accounting it had given the tribe, *see id.* 1215-16.

Finally, the government's contention fails for the basic reason that leaves the headright owners with an "almost useless" accounting right. *See id.* at 1213. *Fletcher II* rejected any interpretation of § 4011(a) or the 1906 Act that would render "pointless" the accounting received by the individual Osage headright owners. *See id.* at 1212. In particular, the court rejected the idea that "the government's accounting obligations extend only to trust fund deposits but *not* withdrawals." *Id.* "Half of an accounting," the circuit court reasoned, "may be closer to no accounting at all." *Id.*

Here, if this court were to follow the government's approach, the individual Osage headright owners would only be entitled to a summary of their respective IIM account statements. Such a right is virtually pointless. As a practical matter, IIM accounts are nothing more than a conduit for facilitating trust distributions to the headright owners. *See Cobell v. Kempthorne*, 532 F. Supp. 2d 37, 39-40 (D.D.C. 2008) (noting that "IIM accounts exist to receive [trust] income … and then to distribute it to account holders when account balances

_____

Although this line of authority certainly supports the government's position, the court cannot follow these decisions here given that they contradict binding Tenth Circuit precedent and the law of the case. *Fletcher II* clearly dictates that plaintiffs are beneficiaries of the trust relationship created under the 1906 Act. *See* 730 F.3d at 1213 ("[T]he 1906 Act creates a trust relationship running directly between the government and individual Osage headright owners….[T]he 1906 Act requires the [government] to hold Osage mineral wealth in trust for *individual* Osage headright owners." (emphasis in original)); *see also id.* at 1209-10 (noting that funds "collected and disbursed under the terms of the 1906 Act…are … held for the benefit of individual members of the Osage Nation"). Because the funds in the Osage tribal trust account are collected and disbursed under the terms of the 1906 Act, *Fletcher II* indicates that plaintiffs are entitled to an accounting of that account.

reach a certain threshold (usually fifteen dollars)"), *vacated on other grounds by* 573 F.3d 808 (D.C. Cir. 2009); 25 C.F.R. § 115.002 (noting that an IIM account holder with an unrestricted account "may determine the timing and amount of disbursement from the account"). Funds deposited in such accounts generally are disbursed (via check or direct deposit) as soon as they are received. [*See, e.g.*, Dkt. #1212-3, Administrative Record, p. 77 (showing that headright income deposited in Charles Pratt's IIM account was paid to him by check on the same day it was received)].[8] Thus, the accounting proposed by the government often will accomplish nothing more than telling each plaintiff the dollar amount of his or her quarterly distribution. Such an accounting gives plaintiffs no meaningful way of determining whether the government has paid them the correct amount or whether it has mismanaged funds prior to distribution.[9] In short, limiting plaintiffs to an accounting of their respective IIM accounts results in the same "useless halfway measure" that the court roundly rejected in *Fletcher II*.

For the foregoing reasons, the court concludes that plaintiffs are entitled to an accounting of the Osage tribal trust account.

_____

[8]  *See also Cobell v. Babbitt*, 91 F. Supp. 2d 1, 10 (D.D.C. 1999) ("[F]unds credited to unsupervised IIM trust accounts, if they meet a monetary threshold of $15.00 ($5.00 for oil and gas), are automatically identified and a check file is created."); Office of the Special Trustee for American Indians, *Frequently Asked Questions (FAQs) from IIM Beneficiaries*, U.S. Dep't of Interior, https://www.doi.gov/ost/FAQs#10 (noting that funds are "automatically disbursed" from an unrestricted IIM account when it reaches a balance of $15 (or $5 for oil and gas payments), and that funds are disbursed "regardless of the amount" if the beneficiary chooses direct deposit).

[9]  The court does not mean to suggest that plaintiffs are not entitled to an accounting of their respective IIM accounts—they are.  *See Cobell v. Norton*, 240 F.3d 1081, 1102 (D.C. Cir. 2001) (noting that IIM trust beneficiaries are entitled to an accounting of their respective IIM accounts under § 4011(a)).  Rather, the court merely holds—consistent with the circuit's decision in *Fletcher II*—that plaintiffs, by virtue of their trust relationship with the government under the 1906 Act, are *also* entitled to an accounting of the Osage tribal trust account.

B.  _Effect of Osage Nation Settlement Agreement_

The court next considers whether the Osage Nation's settlement agreement with the federal government bars plaintiffs from seeking an accounting of the Osage tribal trust account. In March 2000, the Osage Nation filed a lawsuit against the United States in the Court of Federal Claims, alleging that the government had failed to collect and invest Osage royalty income in breach of its duties under the 1906 Act.  In November 2011, the tribe and the federal government settled the case for $380 million.  As part of the settlement agreement, the Osage Nation, "on behalf of itself and the Headright Holders" waived "all claims regarding the United States' obligation to provide a historical accounting or reconciliation of the Osage Tribal Trust Account."  [Dkt. #1212-1, p. 11].

Based on this language, the government asserts, as an affirmative defense, that plaintiffs are barred from seeking an accounting of the tribal trust account.  In response, plaintiffs submit that they were not a party to the settlement agreement at issue and that the Osage Nation has no authority to settle accounting claims on their behalf.[10]  Although the settlement agreement states that the Osage Nation "has the authority to act for…and to bind Headright Holders with respect

_____

[10]  Plaintiffs also contend that the government waived this argument by failing to adequately develop it on appeal.  In particular, plaintiffs point to the Tenth Circuit's observation that this argument was "doubly waived—first for a lack of adequate development in briefing, then for being intentionally abandoned at oral argument."  _Fletcher II_, 730 F.3d at 1214.

Plaintiffs' contention is unpersuasive.  During the last appeal, the argument at issue was raised as an alternative ground for affirmance.  An appellee ordinarily need not raise such alternative arguments in order to preserve them on remand.  _See Oldenkamp v. United Am. Ins. Co._, 619 F.3d 1243, 1249 (10th Cir. 2010) ("Although the Oldenkamps could have advanced this argument as an alternative ground for affirming the district court's ruling in their favor, a party is not required to raise alternative arguments."); _Eichorn v. AT&T Corp._, 484 F.3d 644, 657-58 (3d Cir. 2007) (noting that an appellee is "not required to raise all possible alternative grounds for affirmance to avoid waiving those grounds").  The court, therefore, concludes that the government has preserved this issue and that it is now properly raised.

to matters relating to the Osage Mineral Estate," [*id.* at 2], the government here offers no

evidence or authority to substantiate this assertion.  Rather, the government contends that to the

extent plaintiffs wish to challenge the effect of the settlement agreement, they must first join the

Osage Nation as a necessary and indispensable party under Federal Rule of Civil Procedure 19.

The court starts with the government's Rule 19 argument. That provision reads, in

relevant part, as follows:

**(a) Persons Required to Be Joined if Feasible.**
    **(1) *Required Party.*** A person who is subject to service of process and
whose joinder will not deprive the court of subject-matter jurisdiction
must be joined as a party if:
        **(A)** in that person's absence, the court cannot accord complete
relief among existing parties; or
        **(B)** that person claims an interest relating to the subject of the
action and is so situated that disposing of the action in the person's
absence may:
            **(i)** as a practical matter impair or impede the person's
ability to protect the interest; or
            **(ii)** leave an existing party subject to a substantial risk of
incurring double, multiple, or otherwise inconsistent
obligations because of the interest.
    **(2) *Joinder by Court Order.*** If a person has not been joined as required,
the court must order that the person be made a party. A person who
refuses to join as a plaintiff may be made either a defendant or, in a proper
case, an involuntary plaintiff.
    ….
**(b) When Joinder Is Not Feasible.** If a person who is required to be joined if
feasible cannot be joined, the court must determine whether, in equity and good
conscience, the action should proceed among the existing parties or should be
dismissed. The factors for the court to consider include:
    **(1)** the extent to which a judgment rendered in the person's absence might
prejudice that person or the existing parties;
    **(2)** the extent to which any prejudice could be lessened or avoided by:
        **(A)** protective provisions in the judgment;
        **(B)** shaping the relief; or
        **(C)** other measures;
    **(3)** whether a judgment rendered in the person's absence would be
adequate; and
    **(4)** whether the plaintiff would have an adequate remedy if the action were
dismissed for nonjoinder.

Fed. R. Civ. P. 19(a)-(b).  "Rule 19 provides a three-step process for determining whether an action should be dismissed for failure to join a purportedly indispensable party. First, the court must determine whether the absent person is 'necessary.' … If the absent person is necessary, the court must then determine whether joinder is 'feasible.'" *Citizen Potawatomi Nation v. Norton*, 248 F.3d 993, 997 (10th Cir.) *opinion modified on reh'g*, 257 F.3d 1158 (10th Cir. 2001) (citations omitted).  "Finally, if joinder is not feasible, the court must decide whether the absent person is 'indispensable'.…" *Id.*  Here, joinder of the Osage Nation is not feasible because the Nation possesses sovereign immunity.  *See id.*  Accordingly, the court will consider whether the tribe is necessary and, if so, whether it is also indispensable.

Starting with Rule 19(a), the government does not offer any explanation as to why the Osage Nation is a necessary party.  The tribe certainly is not needed to "accord complete relief among [the] existing parties." Fed. R. Civ. P. 19(a)(1)(A).  Plaintiffs are seeking a historical accounting of the Osage tribal trust account.  The Osage Nation has already waived its right to seek such an accounting.  A decision that plaintiffs are not bound by the tribe's settlement agreement with the federal government accords them all the relief they have requested.  The opposite conclusion results in dismissal.  In either event, complete relief is accorded.

As for the latter joinder provision, the Osage Nation does not appear to have an interest in this litigation.  This case is about *plaintiffs'* accounting rights, not the tribe's.  Providing plaintiffs with an accounting in no way undermines or affects the Osage Nation's separate right to an accounting.  Based on the record before the court, it appears that the only possible tribal interest at stake in this litigation is the Osage Nation's interest in enforcing the waiver provisions of its settlement agreement against the headright owners.  It, however, is by no means clear that the tribe would even claim such an interest.  As the government itself acknowledges, the

headright owners were included in the waiver provision at issue "in a belt and suspenders manner." [Dkt. #1279, p. 52]. Moreover, it is unclear what the Osage Nation would lose if this provision were found to be unenforceable against the headright owners. Finally, even if claimed, such an interest appears entirely baseless. *See Citizen Potawatomi Nation*, 248 F.3d at 998 (noting that "Rule 19 excludes … 'claimed interests that are patently frivolous'" (emphasis omitted) (quoting *Davis v. United States*, 192 F.3d 951, 959 (10th Cir. 1999)). As *Fletcher II* makes clear, § 4011(a) grants *both* the Osage Nation *and* the headright owners the right to an accounting of funds held under the 1906 Act. *See* 730 F.3d at 1209. Nothing in this statutory scheme allows the tribe to waive the separate accounting rights of the headright owners, nor does any provision of the Osage Constitution purport to grant such authority. Accordingly, the court concludes that the Osage Nation is not a necessary party under Rule 19(a)(1).

In any event, even if the Osage Nation were a necessary party, it certainly is not indispensable. In making this determination, the court must consider the four factors set forth in Rule 19(b). As to the first factor, even if the Osage Nation could claim an interest in enforcing its settlement agreement against the headright owners, "the potential of prejudice to that interest is offset in large part by the fact that the [government's] interests in defending [the settlement agreement] is substantially similar, if not virtually identical, to those of the [Osage] Tribe."[11] *Sac & Fox Nation of Missouri v. Norton*, 240 F.3d 1250, 1260 (10th Cir. 2001). Further,

---

[11] [*See* Dkt. #1279, Oct. 2015 Hearing Transcript, p. 59 ("THE COURT: Do the United States and the Osage Nation share the same interest in maintaining the enforceability of their settlement agreement as against the headright holders, and is there any way in which their interests on this issue differ? MR. KIM: I don't know. I think … the tribe would have to come in and they would have to articulate exactly what the interest is. Then we would know whether they were the same or if there was any difference. I don't think there would be a difference but that's just my speculation.")].

"[b]ecause the potential for prejudice is minimal, '[the court] need not be concerned with the second factor, which addresses the availability of means for lessening or avoiding prejudice.'" *Id.* at 1260 (quoting *Rishell v. Jane Phillips Episcopal Med'l Med. Ctr.*, 94 F.3d 1407, 1412 (10th Cir. 1996)).

Turning to the third factor, the court must consider "whether a judgment rendered in the [tribe's] absence would be adequate." Fed. R. Civ. P. 19(b)(3). This "factor is intended to address the adequacy of the dispute's resolution. The concern underlying this factor is not the plaintiff's interest but that of the courts and the public in complete, consistent, and efficient settlement of controversies, that is, the public stake in settling disputes by wholes, whenever possible." *Davis ex rel. Davis v. United States*, 343 F.3d 1282, 1293 (10th Cir. 2003) (citation omitted) (internal quotation marks omitted). Here, it is difficult to see how a judgment rendered in the Osage Nation's absence would be any less adequate than a judgment rendered with the tribe as a party. As previously mentioned, this case involves a dispute over the *plaintiffs'* accounting rights. Because the Osage Nation has already waived its own separate accounting right, the risk that a judgment rendered in the tribe's absence would generate further litigation appears minimal. Accordingly, this factor also weighs against dismissal.

Finally, the court must consider "whether the plaintiff[s] would have an adequate remedy if the action were dismissed for nonjoinder." Fed. R. Civ. P. 19(b)(4). Here, there does not appear to be any alternative forum in which the plaintiffs could pursue their accounting claims if this case were dismissed. The government does not offer any argument to the contrary. Thus, this final factor also weighs against dismissal. In sum, all of the Rule 19(b) factors favor allowing this case to proceed among the existing parties. Accordingly, the court holds that the Osage Nation is neither necessary nor indispensable under Rule 19.

Turning to the merits, the court finds no evidence or authority to support the government's contention that plaintiffs are bound by the Osage Nation's purported waiver of their accounting rights.  As previously mentioned, § 4011(a) grants *both* the Osage Nation *and* the headright owners the right to an accounting of funds held on their behalf under the 1906 Act.  *See Fletcher II*, 730 F.3d at 1209.  Nothing in these provisions, or any other statute cited by the parties, gives the tribe authority to waive the individual accounting rights of the headright owners.  The government contends that the tribe possesses such authority as the "elected representative" of the headright owners, [Dkt. #1279, Oct. 2014 Hearing Transcript, p. 86], but nothing in the Osage Constitution purports to confer such authority, *see* Osage Nation Const. art. 15.  Further, even if it did, such a grant would conflict with—and thus be preempted by—federal law, which assigns separate accounting rights to the plaintiffs and the tribe.  *See Winton v. Amos*, 255 U.S. 373, 391 (1921) ("Congress has plenary authority over the Indians and all their tribal relations, and full power to legislate concerning their tribal property."); *N.L.R.B. v. Pueblo of San Juan*, 276 F.3d 1186, 1191 (10th Cir. 2002) ("Congress in the exercise of its plenary power over Indian affairs may divest Indian tribes of their inherent sovereign authority.").

The individual Osage headright owners were not a party to the settlement agreement at issue.  Indeed, the Court of Federal Claims denied them the opportunity to intervene in the case.  *See Osage Tribe*, 85 Fed. Cl. at 166-79.  Because the Osage Nation lacks authority to waive the plaintiffs' individual accounting rights, they are not bound by the tribe's settlement agreement with the federal government.

### C.  *Scope of the Accounting Due*

Having concluded that plaintiffs are entitled to an accounting of the Osage tribal trust account, the court must determine the specific parameters of the accounting that is due.

Although this was not an issue on appeal, the Tenth Circuit's opinion in *Fletcher II* offers useful guidance.  As the court of appeals explained, plaintiffs are entitled to an accounting with "some degree of information about both receipts and disbursement," but it need not involve "[a] green eye-shade death march through every line of every account over the last one hundred years." *Fletcher II*, 730 F.3d at 1214.  Rather, this "court may focus the inquiry on ways designed to get plaintiffs what they need most without imposing gratuitous costs on the government." *Id.*  In doing so, the court "must seek to balance the often warring (and admittedly incommensurate) considerations of completeness and transparency, on the one hand, and speed, practicality, and cost, on the other." *Id.*  From these principles, it logically follows that plaintiffs

> are entitled only to information that is reasonably necessary to enable them to enforce their rights under the trust.  They are not entitled to information that only loosely relates to their own personal beneficial interests, or to information that is unlikely (because it is so old, or so *de minimis*, say) to have a meaningful effect on their beneficial interests.

*Id.* at 15 (alterations omitted) (citations omitted) (internal quotation marks omitted).

With this guidance in mind, the court turns to the specifics of plaintiffs' request.  The plaintiffs' stated purpose for seeking an accounting is to obtain information that will enable them to prove that the government has paid headright distributions to ineligible recipients and, in that way, improperly diminished their pro rata share.[12]  Neither party, however, has provided the

_____

[12]  *See* Dkt. #1219-3, Tenth Circuit Oral Argument Transcript, p. 16-17 ("JUDGE: So what is it you want beyond a list of current recipients or would that do the trick? …. MR. AAMODT: … I think the answer, your Honor, would be that the United States must demonstrate through the records that it has, that it has in good faith paid the right people the right amount of money."); *id.* at 35 ("What we're looking for is with respect to the payments that are being made, whether or not they are being made to persons that the United States now can say that they understand that they're making them to the right people." (statement of Jason B. Aamodt, plaintiffs' counsel)); *id.* at 36 ("I think upon receiving the accounting that my clients are due, they may challenge the bona fides of particular individuals." (statement of Aamodt)); Brief of Plaintiff-Appellant at

court with a specific accounting proposal reasonably calculated to get at this information without imposing gratuitous costs on the public fisc.  The government's briefs do not address the issue, and the plaintiffs' proposals are either overly broad or so generalized as to be unhelpful.

Adding to the difficulty, the nature and scope of the accounting sought by the plaintiffs has expanded dramatically over time.  Originally, plaintiffs only requested an accounting of trust distributions going back to 2002.[13]  They now seek an accounting of *both* receipts *and*

_____

24-25, *Fletcher v. United States*, 730 F.3d 1206 (10th Cir. 2013) (No. 12–5078), 2011 WL 8968328 ("Specifically, Plaintiffs seek an accounting relating to whether the United States has properly distributed headright payments only to those who may rightfully hold a headright, whether interest was collected and distributed, and whether the correct amounts were distributed to the correct recipients."); Dkt. #231, Sept. 2009 Hearing Transcript, p. 22 ("Currently that data doesn't exist that I'm aware of, being able to—to be able to tell when a particular headright may have been transferred. I think the thing that gets us that data is one of the plaintiffs' requests of the United States with respect to an accounting.  And I think, Your Honor, that if we could get an accounting from the United States with respect to the management of this asset in a reasonable period of time, we could really limit these things." (statement of Aamodt)); Dkt. #1112, Dec. 2010 Hearing Transcript, p. 20 ("[T]he question that we lay out, Judge, of whether or not persons are entitled to receive these monies is not just a simple question of whether or not any non-Osage can obtain.  We concede, in fact we plead in our pleadings that many non-Osages are entitled to receive these funds …. The problem that we have in this case is we don't know which ones they are and there's no way to determine that until an accounting is provided." (statement of Aamodt)); *see also* Dkt. #985-1, Third Amended Complaint, p. 33 (requesting an accounting of headright distributions made pursuant to § 4 of the 1906 Act, without any mention of trust receipts); Dkt. #1144, Plaintiffs' Response in Opposition to Federal Defendant's Motion to Dismiss, p. 16 ("The Plaintiffs' claim is against the Federal Defendants for failing to account for the mismanagement of funds coming *out of* the Osage Mineral Estate through the segregated fund." (emphasis in original));  *Fletcher II*, 730 F.3d at 1215 ("We don't doubt that the plaintiffs ultimately hope to prove that the government has sent money to persons ineligible to receive headright shares under the various amendments to the 1906 Act—and, in this way, improperly diminished their pro rata share.").

[13]  *See* Dkt. #985-1, Third Amended Complaint, p. 33 (requesting an accounting of headright distributions made pursuant to § 4 of the 1906 Act, without any mention of trust receipts); Dkt. #1219-3, Tenth Circuit Oral Argument Transcript, p. 16 ("JUDGE: … And I'm trying to nail you down a little bit further as to what you really want.  Why wouldn't a list of current recipients and amounts do the trick for you?  Is that the nature of the accounting you want or do you want to go all the way back to 1906?  MR. AAMODT: No. I don't—I'm not interested in going back to 1906."); *id.* at 35 ("JUDGE: Okay. So we can go back to the last quarter for now being made, we

distributions going back one-hundred and nine (109) years, to 1906.  [*See* Dkt. #1262, Plaintiffs'

Brief, p. 12, 16].  Further, their most recent request for trust receipts is not limited to information

about the amount and source of money coming into the account, but rather includes such detailed

information as the volume of oil and gas sold, the unit price, and the amount of mineral acreage

that is not currently generating income.  [*See* Dkt. #1262-1, Affidavit of S. Christopher Lopp, pp.

7-9; Dkt. #1279, Oct. 2015 Hearing Transcript, pp. 73-74].[14]  In short, the scope of the

accounting requested by the plaintiffs has grown over the course of this litigation to a point

where it is now almost completely unmoored from the original purpose for which the accounting

was sought.[15]

      The circumstances here do not warrant an accounting so broad.  Having considered the

plaintiffs' stated purpose for seeking an accounting along with the Tenth Circuit's guidance on

the issue, the court concludes that an accounting running from 2002 to the most recent quarter

strikes the appropriate balance in this case.  An accounting spanning this period accords with

plaintiffs' prior requests and gives "plaintiffs what they need most without imposing gratuitous

costs on the government."  *Fletcher II*, 730 F.3d at 1214.  Although plaintiffs now demand an

---

don't have to go back earlier?  Let's say, the last quarter, and the trustee gives you then the
names of the recipients and the amounts received and for that matter the amounts of income in
the trust; that's still not enough for you, is it, you want to know the bona fides of the recipients in
the last quarter.  MR. AAMODT: Oh, your Honor, in terms of time, I think we'd like to see it
back to the filing of the complaint in 2002.");  Dkt. #231, Sept. 2009 Hearing Transcript, p. 23-24
(requesting an accounting of quarterly trust distributions "since 2002 only").

[14]  The court refers to Mr. Lopp's affidavit merely as an indication of the information plaintiffs
currently request.  The court does not rely on the affidavit as evidence.

[15]  It is possible that this change in the relief requested is the result of plaintiffs having altered
their theory of the case—i.e., their reason for seeking an accounting.  Plaintiffs, however, have
not communicated such a change to the court, and, even if they had, the court would be
disinclined to allow it at this late stage of the litigation.

accounting reaching back to 1906, they have not explained why such information is needed to

pursue their misdistribution claim. Plaintiffs may hope to use such information to trace the

transfer of headrights over time. [*Cf.* Dkt. #231, Sept. 2009 Hearing Transcript, p. 22 (noting

that plaintiffs are seeking an accounting "to be able to tell when a particular headright may have

been transferred")]. To the extent that this is their objective, the ends do not justify the cost and

burden on the government. The likelihood that plaintiffs will be able to successfully attack these

transfers in such a way as to meaningfully increase their beneficial interest is remote.[16] *See*

---

[16] Indeed, when considered in light of the relevant statutory scheme, such a challenge appears to bear little chance of success. *Cf. Fletcher II*, 730 F.3d at 1215 (noting that plaintiffs' accounting right does not "necessarily mean that they will even be able to attack through collateral litigation headright transfers long ago approved according to statutorily prescribed processes"). Most of the restrictions that now govern transfer of headrights were enacted in 1978. *See* Cohen's Handbook, *supra*, at 313 n.874, 314 n.878. Before that time, Osage Indians could alienate headrights by intestate succession or, with the Secretary's approval, by will. *See* Act of Apr. 18, 1912, Pub. L. No. 62–125, § 8, 37 Stat. 86, 88; 1906 Act § 6; Cohen's Handbook, *supra*, at 314 n.879. The 1978 Act placed strict limits on the transfer of headrights to non-Osages. *See* Act of Oct. 21, 1978, Pub. L. No. 95–496, § 7, 92 Stat. 1660, 1663 *as amended by* Pub. L. No. 98-605, 98 Stat. 3163 (1984) (technical corrections). Under the 1978 Act, Osage Indians may not transfer anything more than a life estate in their headrights to non-Osages. *See id.* Upon the termination of that life estate, the headright interest would then vest in any specified remaindermen or reversionary interest holders, *provided that* such persons are Osage Indians. *See id.* If no such person exists, the headright interest would then vest in the Osage Nation, *not* the remaining headright owners. *See id.* Given this statutory scheme, it appears unlikely that plaintiffs can collaterally attack a headright transfer made after 1978 in such a way as to increase their beneficial interest. Although plaintiffs might possibly make such a claim with regard to a transfer occurring before 1978, they would first have to show (1) that the headright transfer was unlawful (i.e., that it was not approved by the Secretary), and (2) that there is currently no rightful heir to that headright. The prospect of proving such a claim appears remote.

Finally, even if plaintiffs could successfully make out such a claim, the likelihood that it would have anything more than a de minimis impact on their beneficial interest is more remote still. For example, the average quarterly headright payment between 2006 and 2013 was approximately $7,975.00 per headright. [*See* Dkt. #1212, Administrative Record, p. 30]. Based on this figure, if plaintiffs were to show that one full headright (out of the 2,229 outstanding) had been wrongfully transferred and no longer had a rightful recipient—which, given the fractionalization of headrights, is no easy task—that headright share, once redistributed amongst

*Fletcher II*, 730 F.3d at 1215 (noting that plaintiffs "are not entitled to information that only loosely relates to their own personal beneficial interests, or to information that is unlikely (because it is so old, or so *de minimis,* say) to have a meaningful effect on their beneficial interests"); *cf.* Alan Newman et al., The Law of Trusts and Trustees § 962 (3d ed. 2010) (stating that a trustee's duty to comply with a beneficiary's request for information about the trust "is subject to several limitations," including that "the duty extends only to information requests that are reasonable").  Given the time and costs involved with producing a one-hundred-and-nine-year-long accounting, the court concludes that it would be inequitable to order such relief for the purpose of pursing a claim with such a slight chance of success.

As for content, the court holds that the accounting must include a description of each receipt and distribution for the relevant accounting period.  In particular, the accounting must include the following information: the date and dollar amount of each receipt and distribution; a brief description of the source of each trust receipt; the name of the beneficiary to whom each trust distribution was made; for headright distributions, the respective headright share of each headright owner at the time of distribution; and finally the amount of interest income generated from the tribal trust account and the date at which such interest was credited to the account.[17]

_____

the remaining headright owners, would only increase their respective quarterly distributions by approximately $3.58 per full headright.

[17]  Although courts ordinarily must refrain from telling agencies *how*, specifically, to carry out a statutory duty, *cf. Norton v. S. Utah Wilderness All.*, 542 U.S. 55, 65 (2004) ("[W]hen an agency is compelled by law to act within a certain time period, but the manner of its action is left to the agency's discretion, a court can compel the agency to act, but has no power to specify what the action must be."), that principle applies with less force where, as here, the agency is acting as a trustee and the court is tasked with fashioning an equitable remedy for the agency's breach of a fiduciary duty.  *See Cobell v. Kempthorne*, 455 F.3d 301, 304-05 (D.C. Cir. 2006) ("The narrower judicial powers appropriate under the APA do not apply when the court is fashioning equitable remedies for breaches of fiduciary duties." (alterations omitted) (internal quotation

The accounting set forth above provides plaintiffs with sufficient information to pursue their misdistribution claim and to enforce their rights under the 1906 Act.[18]  It allows the plaintiffs to check the government's math, and gives them "some sense of where money has come from and gone to."  *Fletcher II*, 730 F.3d at 1215. Most importantly, such an accounting strikes an even balance between the "considerations of completeness and transparency, on the one hand, and speed, practicality, and cost, on the other."  *Id.* at 1214.

**IT IS THEREFORE ORDERED** that the government provide plaintiffs with an accounting of the Osage tribal trust account in accordance with the following requirements:

1.  The accounting must run from the first quarter of 2002 until the last available quarter;

2.  The accounting must be divided and organized either by month or by quarter;

3.  The accounting must state the date and dollar amount of each receipt and distribution;

4.  The accounting must briefly identify and describe the source of each trust receipt (i.e., the name of the payer/lessee and the contract number for the oil and/or gas lease on which the payment is made);

5.  The accounting must state the name of the individual or organization to whom each trust distribution was made;

---

marks omitted)).  In such cases, courts "retain[] substantial latitude, much more so than in the typical agency case, to fashion an equitable remedy."  *Id.* (internal quotation marks omitted); *see also Fletcher II*, 730 F.3d at 1211 n.2, 1214 (concluding that this court "possesses considerable discretion 'to mould' the nature and scope of the accounting" that is due, while also noting that plaintiffs' case was brought pursuant to the APA); *Cobell v. Salazar*, 573 F.3d 808, 813 (D.C. Cir. 2009) ("The proper scope of the accounting ultimately remains a question for the district court….").

[18]  Based on the administrative record, it appears that the government already maintains records documenting much of this information.  [*See* Dkt. #1212-2 (monthly account statements for Osage tribal trust account from January 2006 to December 2013)].  Should the government chose to do so, those records, if left unreacted and supplemented with the additional information required herein, could serve as the government's accounting.

6. For headright distributions, the accounting must state the headright interest that each beneficiary possessed at the time of distribution;

7. The accounting must state the amount of interest income generated from the tribal trust account and the date on which such interest was credited to the account.

**IT IS FURTHER ORDERED** that, in accordance with the parties' earlier agreement, all documents, data, and other material obtained pursuant to this accounting shall be considered confidential and subject to the protective order previously entered in this case on August 30, 2006 [*see* Dkt. #52].

**IT IS FURTHER ORDERED** that the government's Motion to Strike Extra-Record Material [Dkt. #1265] is granted in part and denied in part. The motion is granted to the extent the government requests that the court not rely on the extra-record material contained in Dkt. #1262-1 as evidence, but denied to the extent it request that the document be stricken entirely. *See supra* note 14.

ENTERED this 30th day of December, 2015.

GREGORY K. FRIZZELL, CHIEF JUDGE
UNITED STATES DISTRICT COURT