# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF OKLAHOMA

WILLIAM FLETCHER, *et al.*,

        Plaintiffs,

v.

THE UNITED STATES OF AMERICA, *et al.*,

        Defendants.

Case No. 02-CV-427-GKF-JFJ

## OPINION AND ORDER

Before the court is the Motion for Attorney Fees and Costs [Doc. 1353] filed by plaintiffs, William Fletcher, *et al.*[1] For the reasons set forth below, plaintiffs' motion is granted in part and denied in part.

## I.    BACKGROUND

This case has a long and complicated history. Plaintiffs filed the case on May 31, 2002. Their original Complaint contained four claims: (1) that the government's regulations violated their First, Fifth and Fourteenth Amendment rights to vote in Osage tribal elections and to participate in the Osage Tribe's government; (2) that the government breached its trust responsibilities by (a) eliminating plaintiffs' right to participate or vote in Osage tribal elections, and (b) allowing headrights to be alienated to persons not of Osage blood; (3) that the government's failure to manage the Tribe's assets, coupled with the government's inability to keep Osage headrights from passing into the hands of those who are not of Osage blood, constituted a Fifth

---

[1]   The original plaintiffs were William Fletcher, Charles A. Pratt, Juanita W. West, Cora Jean Jech, Betty Woody, and John Berrey. Of these, only William Fletcher and the estate of Charles Pratt remain in the lawsuit. On January 31, 2014, the court certified the following class of plaintiffs with respect to the sole remaining (accounting) claim: "All Indians who currently, or during the pendency of this litigation have received Section 4 Royalty Payments from the segregated fund as determined and calculated by the Defendants, as trustee, pursuant to the 1906 Act § 4 (as amended)." *See* [Doc. 1196].

Amendment taking; and (4) that federal regulations restricting plaintiffs' right to participate in tribal government constituted illegal agency action pursuant to the Administrative Procedures Act, 5 U.S.C. § 706. [Doc. 1, pp. 6–12]. Plaintiffs sought the following relief: (a) an order holding that the federal regulation pertaining to Osage tribal elections violated their constitutional rights; (b) an order holding that the government breached its trust responsibilities by restricting plaintiffs' right to participate in tribal elections and by allowing Osage headrights to be alienated to those not of Osage blood; (c) an order holding that, by allowing the alienation of headright interests to those not of Osage blood, the government effected an unconstitutional taking of a protected property interest; and (d) an order directing the government to pay attorney fees and costs under the Equal Access to Justice Act (EAJA), 28 U.S.C. § 2412.

The government moved to dismiss the Complaint for failure to join the Osage Tribal Council as a necessary and indispensable party under FED. R. CIV. P. 19. On June 6, 2004, Senior United States District Judge James O. Ellison granted the motion to dismiss [Doc. 13]. Plaintiffs appealed. On December 3, 2004, while the appeal was pending, Congress reaffirmed the Osage Tribe's inherent sovereign right to determine its own membership, provided that the rights of any person to Osage mineral estate shares are not diminished thereby. *See* Public Law 108-431, 118 Stat. 2609. On November 19, 2005, the members of the Osage Nation overwhelmingly voted that all adult tribal members, not just mineral rights owners, could vote in future elections. A month later, the Tenth Circuit vacated the dismissal of this case and remanded to determine whether the Osage Tribal Council was a necessary and indispensable party with regard to the breach of trust and takings claims. *See Fletcher v. United States*, 160 F. App'x 792 (10th Cir. Dec. 29, 2005) (hereinafter, *Fletcher I*). The circuit panel held that this court had jurisdiction over plaintiffs' breach of trust and takings claims, as plaintiffs did not seek money damages under 5 U.S.C. § 702.

On remand in 2006, this case was reassigned to United States District Judge Terence Kern, and plaintiffs filed a First Amended Complaint [Doc. 23; Doc. 24]. Plaintiffs asserted three claims: (1) that the government breached its statutory trust responsibilities by wrongfully distributing royalty payments to persons who are not Osage Indians, and by failing to account to plaintiffs for all funds resulting from the Osage Mineral Estate and available to be distributed as trust property; (2) that the government's failure to properly manage the Osage Tribe's trust accounts and funds, coupled with the distribution of headright payments to persons who are not Osage Indians, constituted a taking in violation of the Fifth Amendment; and (3) that the government's administrative actions were not in accordance with law and were contrary to plaintiffs' constitutionally and statutorily guaranteed property rights. Plaintiffs sought certification of a class action and requested the following relief: (a) an order compelling the government to provide an accounting of royalty payments distributed from the Osage Mineral Estate, including whether such royalty payments have been distributed only to Osage Indians; (b) a reformation of plaintiffs' and class members' trust funds found to be due and owing to them, following completion of the accounting; and (c) an order compelling the government to prospectively distribute trust property only to Osage Indians.

The government moved to dismiss the First Amended Complaint on the following grounds: (a) failure to join other necessary and indispensable parties, including the Osage Nation and non-Osage owners of headrights; (b) lack of jurisdiction for failure to comply with the final agency action prerequisites to judicial review under the Administrative Procedures Act, 5 U.S.C. § 701; and (c) failure to challenge an actionable final agency action within the applicable statute of limitations. [Doc. 46].

In 2007, the case was transferred to the undersigned. The court granted the government's motion to dismiss in part and denied it in part, holding that (a) the Osage Nation was not a required

party under Rule 19(a); (b) non-Osage headright owners were required parties because plaintiffs sought to terminate their property interest in quarterly headright royalty distributions; and (c) it was impossible to discern from the face of the First Amended Complaint the specific agency actions and/or inactions plaintiffs were challenging. The court directed plaintiffs to file a Second Amended Complaint adding all non-Osage headright owners as defendants and identifying with specificity the challenged agency actions and/or inactions. [Doc. 79].

On June 12, 2009, plaintiffs filed their Second Amended Complaint [Doc. 97], which joined the approximately 1,700 non-Osage headright owners. However, because plaintiffs again failed to specify the agency actions being challenged, the court again ordered plaintiffs to amend. [Doc. 213]. Plaintiffs filed their Third Amended Complaint [Doc. 985] on May 6, 2010.

Many of the non-Osage headright owners filed motions to dismiss. In an Opinion and Order [Doc. 1122] dated March 31, 2011, the court granted a motion to dismiss filed by defendant Ben T. Benedum for failure of the Third Amended Complaint to state a claim upon which relief could be granted. The court rejected plaintiffs' overarching legal argument that the Osage Allotment Act precludes non-Osage from receiving quarterly income payments from the Osage mineral estate. [Doc. 1122, p. 9]. On May 16, 2011, the court dismissed the remaining 1,700 non-Osage headright owners for the same reason. [Doc. 1143].

On May 2, 2011, the government moved to dismiss the Third Amended Complaint, contending that the portions premised on plaintiffs' argument that non-Osage cannot hold legal or equitable title to a headright should be dismissed for (1) failure to state a claim; (2) lack of subject matter jurisdiction; and (3) failure to identify a specific final agency action for judicial review. The government also argued that the portions of the Third Amended Complaint in which plaintiffs claimed a right to an accounting should be dismissed because there was no trust relationship between the government and headright owners, and because the statutes upon which plaintiffs

relied did not afford them a right to an accounting.  The court granted the motion to dismiss as to the allegations of wrongful distributions to non-Osage headright owners for failure to state a claim and for failure to specify any challenged agency actions or inactions.  The court rejected the government's argument that it has no trust obligations to headright owners, but held that plaintiffs had not identified a statutory right to an accounting of distributions from the Osage Mineral Estate. [Doc. 1164].  Plaintiffs appealed the dismissal of the accounting claim, and the Tenth Circuit reversed and remanded, holding that plaintiffs were entitled to seek an accounting under 25 U.S.C. § 4011(a).  *Fletcher v. United States*, 730 F.3d 1206 (10th Cir. 2013) (hereinafter, *Fletcher II*).

On remand, this court granted plaintiffs' Motion to Certify Class [Doc. 1196].  The government filed the administrative record, and the parties briefed the scope of the government's accounting duty.  The court concluded that plaintiffs were not limited to an accounting of their respective Individual Indian Money (IIM) accounts, but were entitled to an accounting of the Osage tribal trust account, and that the Osage Nation had not waived the plaintiffs' individual accounting rights in connection with the Nation's settlement of a lawsuit against the United States in the Court of Federal Claims.  *Fletcher v. United States*, 153 F. Supp. 3d 1354, 1361–68 (N.D. Okla. 2015).  The court then ordered the government to provide plaintiffs an accounting running from the first quarter of 2002, and specified six additional requirements.

Both parties then filed Rule 59(e) motions to alter or amend the judgment.  The court granted the government's request for additional time to complete the accounting, and granted plaintiffs' request to have the accounting deadline run from the entry of the court's judgment.  However, the court denied plaintiffs' request to require a more detailed accounting and to expand the time frame of the accounting back to 1906.  *Fletcher v. United States*, 2016 WL 927196 (N.D. Okla. Mar. 11, 2016), [Doc. 1306].

Plaintiffs appealed and the Tenth Circuit affirmed. The panel held that the district court did not abuse its discretion when it ordered the accounting to run from 2002, and noted that "even if a more detailed accounting might uncover additional evidence of misdistribution, the increased expense to do so is not justified." *Fletcher v. United States*, 854 F.3d 1201, 1207 (10th Cir. 2017) (hereinafter, *Fletcher III*).

In their initial motion for attorney fees and costs under EAJA, plaintiffs requested $1,835,665.19 in attorney fees and $57,817.43 in costs and "other expenses." [Doc. 1291, p. 15]. In response, the government argued that plaintiffs had failed to satisfy certain threshold eligibility requirements. The government argued that threshold legal questions existed as to plaintiffs' net worth eligibility under EAJA. It also argued that plaintiffs had not met their burden of demonstrating that they have "incurred" fees and other expenses for which reimbursement is proper under EAJA; that no EAJA award is proper because the government's position was substantially justified; and that any award must be limited because plaintiffs only partially prevailed. *See* [Doc. 1316]. Concurrently with their initial fee request, plaintiffs filed a Bill of Costs pursuant to FED. R. CIV. P. 54(d)(1), seeking $34,839.61. [Doc. 1290]. The Court Clerk held a hearing and taxed costs in the amount of $30,003.19 pursuant to Rule 54. [Doc. 1317]. The government then moved to review the Clerk's taxation of costs, arguing that plaintiffs' Bill of Costs must be considered under EAJA. [Doc. 1322].

The court stayed the proceedings on plaintiffs' Motion for Attorney's Fees and Costs under EAJA pending plaintiffs' appeal of the court's accounting order. [Doc. 1337]. Upon the issuance of the mandate affirming the accounting order, this court issued an order granting the government's Motion to Review the Court Clerk's Taxation of costs, concluding that "any award of costs must be evaluated pursuant to EAJA, not Rule 54." [Doc. 1345, p. 3]. The court directed the parties to "address the appropriateness of recovery of . . . court costs under EAJA in supplemental briefing,

specifically identifying, attributing, and separating expenses in relation to the claim on which plaintiffs prevailed." [Doc. 1345, p. 3].

On June 22, 2017, plaintiffs moved to lift the stay, and sought leave to re-file or supplement their EAJA motion. [Doc. 1346]. On July 13, 2017, the court granted the plaintiffs' motion to lift the stay, struck plaintiffs' first motion for fees and costs, and ordered consolidated briefing as follows:

> Because EAJA governs this court's analysis on both attorneys' fees and court cost issues, the court strikes plaintiffs' pending requests on both those subjects and orders consolidated briefing on the following: (1) threshold EAJA issues identified above and in Doc. 1316[2]; and (2) identification, attribution, and separation of attorney's fees and costs in relation to the claim on which plaintiffs prevailed. However, plaintiffs shall not be permitted to request attorneys' fees or costs in excess of the amounts previously stated in their bill of costs or their initial attorneys' fees briefing.

[Doc. 1348, pp. 1–2].

Plaintiffs filed their second motion for EAJA fees and costs on August 17, 2017. [Doc. 1353]. The following day, the court discovered that plaintiffs had submitted lump sum billing summaries for their attorney fees and expenses, which did not meet EAJA's standard that a prevailing party must provide sufficient detail for time spent. The court directed plaintiffs to file detailed attorney time records identifying, at a minimum, the attorney(s) who performed the work, a description of the work performed, the time allocated to each task, and the hourly rate. [Doc. 1354]. On August 25, 2017, plaintiffs filed their time records. [Doc. 1355]. Shortly thereafter, on September 5, 2017, the government moved to strike plaintiffs' second EAJA motion and time records on the grounds that plaintiffs (1) had not addressed whether their costs and fees

---

[2] Doc. 1316 is Defendants' Response to Plaintiffs' [first] Motion for Attorney's Fees and Costs under Equal Access to Justice Act. In that brief, the government argued that plaintiffs had not met their burden to demonstrate they "incurred" fees or other expenses; that the government's position was substantially justified; that plaintiffs only partially prevailed; and that plaintiffs had not met their burden to establish their net worth eligibility.

were "incurred"; (2) had not complied with this court's directive to identify, attribute, and separate attorney fees and costs in relation to the claim on which plaintiffs prevailed; (3) had requested attorney fees and costs in excess of the amounts previously requested, in violation of the court's Order of July 13, 2017; and (4) had submitted new evidence in the form of a purported expert declaration. The court denied the government's motion to strike, but granted the government's alternative request for an extension of time to present its defenses to plaintiffs' EAJA claims. [Doc. 1357].

The government responded to plaintiffs' second EAJA motion on March 30, 2018. [Doc. 1379]. Plaintiffs filed a motion to strike [Doc. 1386] the expert declaration attached to the government's response, which the court granted. Plaintiffs filed a reply, and briefing on the EAJA motion is now complete.

## II.     THE APPLICABLE STANDARDS

EAJA provides that a prevailing party shall recover reasonable attorney fees and expenses incurred in any civil action against the United States, unless the position of the United States was substantially justified or special circumstances make an award unjust:

> Except as otherwise specifically provided by statute, a court shall award to a prevailing party other than the United States fees and other expenses, in addition to any costs awarded pursuant to subsection (a), incurred by that party in any civil action (other than cases sounding in tort), including proceedings for judicial review of agency action, brought by or against the United States in any court having jurisdiction of that action, unless the court finds that the position of the United States was substantially justified or that special circumstances make an award unjust.

28 U.S.C. § 2412(d)(1)(A). EAJA also provides that a prevailing party may recover costs incurred in any civil action against the United States or one of its agencies:

> Except as otherwise specifically provided by statute, a judgment for costs, as enumerated in section 1920 of this title, but not including the fees and expenses of attorneys, may be awarded to the prevailing

party in any civil action brought by or against the United States or any agency or any official of the United States acting in his or her official capacity in any court having jurisdiction of such action. A judgment for costs when taxed against the United States shall, in an amount established by statute, court rule, or order, be limited to reimbursing in whole or in part the prevailing party for the costs incurred by such party in the litigation.

*Id.* § 2412(a)(1).

## III.   THE REQUEST FOR EAJA FEES AND EXPENSES

Plaintiffs' request for EAJA fees and expenses presents two primary issues: (a) whether plaintiffs are entitled to recover fees and expenses under EAJA; and, if so, (b) whether the request is reasonable. For the reasons set forth below, the court holds that plaintiffs are not entitled to recover fees and expenses under EAJA. Moreover, even if plaintiffs were so entitled, their request is unreasonable and excessive.

### a.   *Plaintiffs' Entitlement to Recovery*

In order for plaintiffs to recover reasonable fees and expenses under EAJA, the court must find that (i) the named plaintiffs meet EAJA's net worth eligibility requirement; (ii) plaintiffs are the prevailing parties; (iii) plaintiffs have "incurred" fees and expenses; (iv) the government's position was not substantially justified; and (v) no special circumstances make recovery unjust.

### i.   Plaintiffs meet EAJA's net worth eligibility requirement

An individual seeking an EAJA award must establish that his or her "net worth did not exceed $2,000,000 at the time the civil action was filed." 28 U.S.C. § 2412(d)(2)(B). "Net worth" is calculated by subtracting total liabilities from total assets. *Shooting Star Ranch, LLC v. United States*, 230 F.3d 1176, 1178 (10th Cir. 2000). In a class action such as this, the named plaintiffs must each satisfy the net worth requirement. *Olenhouse v. Commodity Credit Corp.*, 922 F. Supp. 489, 493 (D. Kan. 1996). "In the face of a challenge to a party's eligibility for an EAJA award, that party must do more than make a bare assertion that it meets the statutory criteria. This is

especially true when the government points to facts indicating that a serious question exists as to the party's eligibility." *United States v. 819.8 Acres of Land*, 133 F.3d 933, at *3 (10th Cir. Jan. 7, 1998) (table). "However, the Tenth Circuit has indicated that absent a challenge otherwise, an affidavit from a party indicating that they meet the net worth requirement is sufficient." *United States v. Gwilliam*, 2012 WL 3527893, at *2 (D. Utah Aug. 2012) (citing *819.8 Acres*, 133 F.3d 933, at *3 and *Shooting Star*, 230 F.3d at 1178).

As an initial matter, the parties dispute the date on which the named plaintiffs' net worths should be determined. Plaintiffs argue for the date they filed their original Complaint (May 31, 2002), since EAJA defines a "party" as an individual whose net worth did not exceed $2,000,000 *at the time the civil action was filed.*" 28 U.S.C. § 2412(d)(2)(B) (emphasis added). The government argues for April 4, 2006, because plaintiffs first asserted an accounting claim in their First Amended Complaint filed that day. Based upon the statutory language, the court concludes that the date on which plaintiffs' net worth is to be determined is May 31, 2002.

To establish their net worth, plaintiffs have submitted the declarations of Tara Damron, the executor of the estate of named plaintiff Charles Arthur Pratt, Jr., and the declaration of plaintiff William S. Fletcher. Damron declares that Pratt's net worth did not exceed $2 million on or after May 31, 2002; that Pratt's assets in 2002 included his $170,000 house and three vehicles; and that his W-2 income for 2002 was $14,533.36. [Doc. 1353-11]. Fletcher declares that he "had some real estate holdings, [a] BIA account, and a bank account in May, 2002, but [he does] not know the exact balances of the accounts or the exact values of the other assets"; that he is "confident that the total value of all [his] assets as of May 2002, was less than $2 million"; and that "most of the information needed to determine the values of his assets in May, 2002, can be provided by the [BIA] . . . [and he is] in the process of retrieving, compiling, and analyzing the detailed information . . . . [and] will supplement [his] declaration to set forth the details and to attach copies of relevant

- 10 -

account statements and other documents." [Doc. 1353-12]. No such supplement has been submitted.

Plaintiffs have also submitted an affidavit of S. Christopher Lopp, a certified public accountant with the CPA firm HoganTaylor LLP in Tulsa, Oklahoma, calculating the net worth of the five named plaintiffs on May 31, 2002. Lopp states he "applied Generally Accepted Accounting Principles and other appropriate methods of valuation in arriving at the net worth of each Plaintiff":

> I have reviewed the property ownership records of the five Plaintiffs in this case, William Fletcher, Charles Pratt, John Berrey, Juanita West, and Cora Jech. A search of land and mineral interest ownership in Oklahoma was performed as well as a search of the LexisNexis database for land and appraisal values in other States. County Assessor Values were used for mineral and real estate interests. For purposes of this analysis, I have assumed that cash and cash equivalents for each Plaintiff are $250,000, and it has been affirmed that this number exceeds actual balances in all cases, thus providing a conservatively high estimate of value. For each valuation date, I utilized a commonly accepted rule of thumb that multiples [sic] the sum of the prior 4 quarterly Headrights payments times 6 as a Fair Market Value of a Headrights interest. It was not necessary to evaluate the debt position of any Plaintiff as no Plaintiff had assets in excess of $2 million. The actual net worth of each individual would be lowered by the amounts of outstanding debt as of each valuation date, if any. My calculations in summary and detail are shown in Exhibits 1 to 7 following.

[Doc. 1353-13, pp. 1–2, ¶¶ 2–3]. Lopp calculated each named plaintiff's net worth as of May 31, 2002 as less than $2 million. [*Id.*, p. 2, ¶ 4]. He calculated Fletcher's net worth as $971,258; Pratt's net worth as $424,997; Berrey's net worth as $572,161; West's net worth as $595,029; and Jech's net worth as $879,801. [Doc. 1353-13, p. 3].

The government argues that plaintiffs either fail to meet the $2 million net worth requirement, or, at least, have failed to carry their burden to show that they meet this requirement. The government focuses exclusively on Fletcher, arguing his declaration is insufficient because he

states only that he is "confident that the total value of all of [his] assets as of May, 2002, was less than $2 million," and because he never supplemented his declaration as promised. As to Lopp's declaration, the government argues his assumption "that cash and cash equivalents for each Plaintiff [was] $250,000" is unsubstantiated. The government challenged Lopp's methodology through the declaration of Colleen Stegner, a Program Analyst for the Department of the Interior's Office of Historical Trust Accounting. [Doc. 1379-4; Doc. 1379-5; Doc. 1382]. Stegner calculated the values of Fletcher's headright and real estate interests as $278,833.00 and $1,037,739.50, respectively (for a total of $1,316,572.50) on May 31, 2002, and as exceeding $2 million on and after April 4, 2006. [Doc. 1379-4, p. 6, ¶¶ 9, 13, 14]. However, the court struck Stegner's declaration pursuant to FED. R. EVID. 702 and denied the government's motion to substitute a new declaration. [Doc. 1391; Doc. 1398].

The government has not "pointed to facts indicating that a serious question exists as to [Fletcher's] eligibility" on May 31, 2002. *819.8 Acres*, 133 F.3d 933, at *3. Indeed, it acknowledges that Fletcher's net worth was less than $2 million at that time. [Doc. 1379, p. 21] ("Thus, only on May 31, 2002, did Mr. Fletcher appear to meet the net worth eligibility criteria, making the correct date to use for this purpose of critical importance."). Even if Fletcher's cash and cash equivalents were two and a half times the amount Lopp assumes, Fletcher's net worth on May 31, 2002 would still be less than $2 million.

Furthermore, plaintiffs have done "more than make a bare assertion that [they] meet[] the statutory criteria." *819.8 Acres*, 133 F.3d 933, at *3. They have submitted the sworn and notarized declaration of Lopp, a certified public accountant, who calculated each named plaintiff's net worth as less than $2 million on May 31, 2002, pursuant to "Generally Accepted Accounting Principles and other appropriate methods of valuation." [Doc. 1353-13, p. 1, ¶ 2]; *see Shooting Star*, 230 F.3d at 1178 ("[G]enerally accepted accounting principles apply to the net worth inquiry.").

Lopp's declaration is sufficient to establish that each named plaintiffs' "net worth did not exceed $2,000,000 at the time the civil action was filed." 28 U.S.C. § 2412(d)(2)(B).

ii.     Plaintiffs are prevailing parties

A "prevailing party" is one who has been awarded some relief by the court. *Buckhannon Bd. and Care Home, Inc. v. West Virginia Dep't of Health and Human Res.*, 532 U.S. 598, 603 (2001). "[P]laintiffs may be considered 'prevailing parties' for attorney's fees purposes if they succeed on any significant issue in litigation which achieves some of the benefit the parties sought in bringing suit." *Hensley v. Eckerhart*, 461 U.S. 424, 433 (1983).

Here, though the accounting claim was only one of several claims for relief, and though it was not the most significant issue presented, the plaintiffs may be considered prevailing parties insofar as they succeeded on an issue which achieved some of the benefit they sought in bringing suit.

iii.     Plaintiffs have not incurred attorney fees under EAJA

EAJA requires that fees and expenses be "incurred" by the party seeking an award. 28 U.S.C. § 2412(d)(1)(A). As a matter of statutory interpretation, "litigants 'incur' fees under the EAJA when they have an express or implied legal obligation to pay over such an award to their legal representatives . . . ." *Turner v. Comm'r of Social Sec.*, 680 F.3d 721, 725 (6th Cir. 2012); *see also Ed A. Wilson, Inc. v. Gen. Servs. Admin.*, 126 F.3d 1406, 1409 (Fed. Cir. 1997) ("There must be an express or implied agreement . . . that the fee award will be paid to the legal representative.").

As noted above, on July 13, 2017, the court struck plaintiffs' initial EAJA request and ordered plaintiffs to brief threshold EAJA issues, including whether plaintiffs had "incurred" any fees, expenses or costs subject to reimbursement. [Doc. 1348, p. 1]. Plaintiffs then failed to address this issue in their initial brief, and did not attach any fee agreements as exhibits. *See*

[Doc. 1353]. Although they submitted declarations of their attorneys, those declarations simply state that the attorneys "undertook the representation of Mr. Fletcher and [their] class clients on a fully contingent basis, and would recover no amount for costs, expenses, or time unless the case succeeded." [Doc. 1353-14, ¶ 4; Doc. 1353-15, ¶ 4; Doc. 1353-16, ¶ 3].

In their response, the government contends plaintiffs have not established that they incurred fees and costs under EAJA. The government has submitted copies of engagement letters signed by Fletcher and Pratt on or about December 11, 2009. Section 4 of both engagement letters provides as follows:

> **4.**    **Attorney Fees**.    The Lawyers will charge a reasonable fee for services rendered.  Our fee will be a contingent fee.  The Lawyers will not be paid for our time and our work as lawyers unless:
>
> (a)    the captioned case settles; or
>
> (b)    the Government is ordered to pay over amounts improperly paid to non-Osages pursuant to an order of the United States District Court for the Northern District of Oklahoma, as referenced above; and/or
>
> (c)    the Lawyers obtain funding from a third party willing to underwrite all or part of our fees.
>
> The amount of our fee will be forty (40%) of the amount (i) paid in settlement; or (ii) paid by the Government pursuant to the order of the United States District Court for the Northern District of Oklahoma and any amount awarded as fees; or such other amount as that Court, or any reviewing court, may determine and order.

[Doc. 1379-1, pp. 3, 8]. As the government correctly contends, this language precludes plaintiffs' lawyers from recovering fees in this case, because none of the explicitly listed conditions have occurred.

In reply, plaintiffs cite caselaw for the proposition that contingency fee agreements do not prevent an award of fees. While this is true as a general matter, the cases on which plaintiffs rely do not support an award of fees under EAJA unless fees were incurred by the party. In *Turner*,

the Sixth Circuit held plaintiffs "incurred" fees under contingency fee agreements, but only after concluding that the agreements contained "an express or implied legal obligation to pay over such an award to their legal representatives." 680 F.3d at 724–25 ("Because the representation agreements for Turner, Campbell, and Corns each contain such a provision, they have each 'incurred' attorney's fees . . . ."). The court explained that this obligation furthers EAJA's statutory purpose by preventing windfalls: "the requirement that a litigant have a legal obligation to *pay over* any fee award to his attorney prevents litigants from pocketing these awards, because litigants with no obligation to pay over fees do not 'incur' them." *Id.* at 725 (emphasis in original). *See* [Doc. 1399, pp. 6–7 (citing *Frazier v. Apfel*, 240 F.3d 1284 (10th Cir. 2001); *Gordon v. Astrue*, 361 F. App'x 933 (10th Cir. 2010); *Kemp v. Bowen*, 822 F.2d 966 (10th Cir. 1987); and *United States v. Adkinson*, 256 F. Supp. 2d 1297, 1316–17 (N.D. Fla. 2003) (the fee agreed to in the contract caps an EAJA award under § 2412(d)), *aff'd*, 360 F.3d 1257, 1259 (11th Cir. 2004))].

Alternatively, plaintiffs point to an unsigned engagement letter dated May 2, 2002, between Jason Aamodt as attorney and Fletcher and Pratt as clients. *See* Plaintiff's Reply, [Doc. 1399, p. 6, n.3]. Attached to the unsigned engagement letter is a statement setting forth the "standard terms of payment" for Aamodt's legal services. The statement provides that Aamodt agrees to work on a contingency basis, that Aamodt shall receive forty percent (40%) of anything of value received or the value of time expended on plaintiffs' behalf as charged in his statements, that Aamodt will seek attorney fees on plaintiffs' behalf, and that "[i]f attorney fees are obtained, [plaintiffs] agree [Aamodt] shall retain them and that the attorney fees obtained will be credited against any attorney fees [plaintiffs] owe to [Aamodt]." [Doc. 1399-1, p. 5]. Mr. Aamodt has assured the court that the only copy available was one that he had on a computer server, that plaintiffs' counsel did not have a signed copy, and that Mr. Fletcher did not have a signed or unsigned copy. [Doc. 1376, pp. 7:9–8:25]. Furthermore, Mr. Fletcher testified he has no memory of seeing or signing the

document.  [Doc. 1370-1, pp. 78–81].  For these reasons, the court may not consider the May 2, 2002 fee agreement as evidence that plaintiffs incurred fees under EAJA.

Plaintiffs have presented no evidence that they have "incurred" fees.  Rather, the engagement letters provide that the lawyers "will *not be paid* for [their] time and [their] work as lawyers unless" one of the three listed conditions have occurred—and none of them have.  [Doc. 1379-1, pp. 3, 8] (emphasis added); *see Adkinson*, 256 F. Supp. 2d at 1317 ("Section 2412(d) requires the fees be actually incurred to be reimbursable . . . .").  Because plaintiffs have not shown they incurred fees under EAJA, they are not entitled to an attorney fee award.[3]

iv.  <u>The government's position was substantially justified</u>

The government bears the burden of proving its position was substantially justified.  *Scarborough v. Principi,* 541 U.S. 401, 414 (2004); *Hackett v. Barnhart*, 475 F.3d 1166, 1172 (10th Cir. 2007).  EAJA provides that "[w]hether or not the position of the United States was substantially justified shall be determined on the basis of the record (including the record with respect to the action or failure to act by the agency upon which the civil action is based) which is made in the civil action for which fees and other expenses are sought."  28 U.S.C. § 2412(d)(1)(B).  The test for substantial justification is one of reasonableness in law and fact.  *Hackett*, 475 F.3d at 1172.  The government's position can be substantially justified even though it is not correct.  *Pierce v. Underwood,* 487 U.S. 552, 266 n.2 (1988); *Madron v. Astrue*, 646 F.3d 1255, 1257 (10th Cir. 2011) (quoting *Hackett*, 475 F.3d at 1172).

The fact that EAJA denominates the "position of the United States" in the singular buttresses the conclusion "that only one threshold determination for the entire civil action is to be

---

[3]    In contrast, plaintiffs incurred *costs* pursuant to the terms of the December 2009 engagement letters.  *See* [Doc. 1379-1, pp. 3, 8] ("From time to time, the Lawyers may advance on your behalf certain costs and expenses.  However, the Clients remain liable for payment of all costs and expenses incurred by the Lawyers on their behalf and on behalf of the plaintiff class.").

made." *Comm'r, I.N.S. v. Jean*, 496 U.S. 154, 159 (1990). "While the parties' postures on individual matters may be more or less justified, the EAJA—like other fee-shifting statutes—favors treating a case as an inclusive whole, rather than as atomized line-items." *Id.* at 161–62. Even prior to *Jean*, the Tenth Circuit had instructed its district courts "to determine whether the government's position was substantially justified based on the totality of the circumstances, as reflected in the record before the court." *United States v. Charles Gyurman Land & Cattle Co.*, 836 F.2d 480, 485 (10th Cir. 1987).

Although the Supreme Court's directive in *Jean* may at first appear sufficiently broad to resolve the issue presented here, *Jean* involved the narrow issue of whether EAJA required a second finding that the government's position in a separate *stage* of litigation (the fee litigation itself) was substantially justified. Here, in contrast, plaintiffs advanced multiple claims, and federal courts are split on how the analysis should be conducted in such cases. *E.E.O.C. v. Memphis Health Ctr., Inc.*, 526 F. App'x 607, 614 (6th Cir. 2013); *Ibrahim v. U.S. Dept. of Homeland Security*, 912 F.3d 1147, 1169 n.16 (9th Cir. 2019) (*en banc*) (collecting cases).

For example, the Fourth Circuit relies on *Jean* as directing a "broadly focused analysis that would reject the view that *any* unreasonable position taken by the government during the course of litigation automatically opens the door to an EAJA fee award." *Roanoke River Basin Assoc. v. Hudson*, 991 F.2d 132, 139 (4th Cir. 1993). Rather, "when determining whether the government's position in a case is substantially justified, we look beyond the issue on which the petitioner prevailed to determine, from the totality of circumstances, whether the government acted reasonably in causing the litigation or in taking a stance during the litigation." *Id.*; *Meyer v. Colvin*, 754 F.3d 251, 255 (4th Cir. 2014). The Fourth Circuit reasoned that, "[w]hile the EAJA redresses governmental abuse, it was never intended to chill the government's right to litigate or to subject the public fisc to added risk of loss when the government chooses to litigate reasonably

substantiated positions, whether or not the position later turns out to be wrong." *Roanoke River Basin Assoc.*, 991 F.2d at 139.  Most circuits agree.  *See, e.g.*, *Glenn v. Comm'r of Soc. Sec.*, 763 F.3d 494, 498–99 (6th Cir. 2014) (adopting a single inquiry test); *United States v. Hurt*, 676 F.3d 649, 653–54 (8th Cir. 2012); and *Ibrahim*, 912 F.3d at 1168–72.  Some courts have evaluated whether the government's position as a whole was substantially justified based on the more "prominent" claims.  *See Amezola-Garcia v. Lynch*, 835 F.3d 553, 555 (6th Cir. 2016), and *Gatimi v. Holder*, 606 F.3d 344, 350 (7th Cir. 2010).  In comparison, the Third Circuit requires district courts to evaluate every significant argument made by an agency to determine if the argument is substantially justified, in order to determine whether, as a whole, the government's position was substantially justified.  *Hanover Potato Prods., Inc. v. Shalala*, 989 F.2d 123, 131 (3rd Cir. 1993).

The D.C. Circuit has taken a different approach.  It rejected the Federal Aviation Administration's reliance on *Roanoke River Basin* in a case where the FAA had prevailed on four procedural issues, but lost on the substantive issue, and the Circuit had therefore vacated a fee schedule imposed against foreign air carriers for services provided to airline overflights.  *Air Trans. Ass'n of Canada v. F.A.A.*, 156 F.3d 1329, 1332 (D.C. Cir. 1998).  The court concluded that the petitioner was entitled to a fee award, observing that "it cannot be the case that Congress intended that a party who prevails on an essential ground of a petition to set aside government action cannot recover the congressionally contemplated fees because the government's action was substantially unjustified on only one of several possible bases."  *Id.* at 1332.  One D.C. district court subsequently read *Jean* as permitting two separate substantial justification determinations where the amended complaint, filed post-remand, was akin to an entirely new civil action.  *See Tripoli Rocketry Ass'n, Inc. v. ATF*, 698 F. Supp. 2d 168, 175 (D.D.C. 2010).  However, another district judge in D.C. later held that only one threshold determination was proper where the

government sought separate substantial justification determinations for its procedural and substantive arguments. *See Bennett v. Castro*, 74 F. Supp. 3d 382, 393 n.2 (D.D.C. 2014).

The majority of courts have recognized that the type of claim-by-claim substantial justification determination advocated by plaintiffs is difficult to reconcile with the EAJA's text. As the Supreme Court stated in *Jean,* the term "position of the United States" in § 2412(d)(2)(D) of the EAJA "is [] denominated in the singular . . . [and] buttresses the conclusion that only one threshold determination for the entire civil action is to be made." *Jean*, 496 U.S. at 159. Permitting claim-by-claim substantial justification determinations also risks running afoul of the Supreme Court's admonition that "[a] request for attorney's fees should not result in a second major litigation." *Id.* at 163. However, the fact that the government prevailed on most issues is not determinative. *Hackett*, 475 F.3d at 1173 n.1.

For the reasons discussed below, the court concludes that the position of the United States in this case as a whole was substantially justified, and its position on the more prominent claims is not outweighed by its position on the accounting claim.

The claims plaintiffs made over the course of this long-running lawsuit fall within three general categories—1) tribal voting rights; 2) breach of trust responsibilities, including allowing headrights to be alienated to persons not of Osage blood; and 3) an accounting. The court will address the positions taken by the United States as to each of these claims.

In 2004, Judge Ellison dismissed plaintiffs' tribal voting rights claim for failure to join a necessary and indispensable party. The United States had argued that the Osage Tribal Council was a necessary and indispensable party that could not be joined because of sovereign immunity. The judge agreed, concluding that "[a]lthough both the factual allegations and the relief requested appear to have been carefully crafted to exclude the Tribal Council, it is clear that granting the remedy requested by plaintiffs would require a significant change in voting procedures and result

in a significant change in the government and membership of the tribe . . . ." [Doc. 13, p. 4]. As mentioned above, Congress then reaffirmed the Osage Tribe's right to determine its membership for the purpose of tribal voting rights, *see* Public Law 108-431, 118 Stat. 2609, and the members of the Osage Nation voted that all adult tribal members, not just mineral rights owners, could vote in tribal elections. As a result, plaintiffs did not contest the dismissal of their tribal voting rights claim. *Fletcher I*, 160 F. App'x at 794. The court finds that the position of the United States regarding the voting rights claim was reasonable in fact and law.

The position of the United States on plaintiffs' claim of wrongful distributions of quarterly royalty income to persons who are not Osage Indians was also reasonable. After plaintiffs filed their First Amended Complaint, the government moved to dismiss for failure to join other indispensable parties, including the Osage Nation and non-Osage owners of headrights; for lack of jurisdiction for failure to comply with the final agency action prerequisites to judicial review under the Administrative Procedures Act, 5 U.S.C. § 701; and for failure to challenge an actionable final agency action within the applicable statute of limitations. The court granted the motion in part and denied it in part, holding that the Osage Nation was not a required party under Rule 19(a); that non-Osage headright owners were required parties because plaintiffs sought to terminate their headright interests in royalty income; and that it was impossible to discern from the face of the First Amended Complaint the specific agency actions and/or inactions plaintiffs were challenging. The court directed plaintiffs to file a Second Amended Complaint adding all non-Osage headright owners as defendants and identifying with specificity the challenged agency actions and/or inactions.

Plaintiffs Second Amended Complaint joined approximately 1,700 non-Osage headright owners, but similarly failed to specify the agency actions being challenged. As a result, the court directed plaintiffs to file a Third Amended Complaint. Upon the filing of the Third Amended

Complaint, many non-Osage headright owner defendants filed motions to dismiss. The court granted those motions, concluding that plaintiffs were incorrect as a matter of law in their contention that a non-Indian cannot hold legal or equitable title.

The United States moved to dismiss the allegations in the Third Amended Complaint that it had wrongfully distributed royalty payments to non-Osage headright owners, and the court granted that motion. The court finds that the position of the United States in defense of plaintiffs' wrongful distribution claim was reasonable in fact and law.

The United States' motion also sought to dismiss plaintiffs' accounting claim, arguing there was no trust relationship between the government and headright owners because the Osage mineral estate was placed in trust for the tribe, whereas headrights were allotted to individuals as property rights. The court rejected this argument, finding the existence of a trust relationship was clear based on statutory language and precedent from the Tenth Circuit and the Court of Federal Claims. "At the least," the court held, "the 1906 Act imposes a trust obligation upon the Federal government to distribute royalty payments to headright owners in a timely and proper manner." [Doc. 1164, p. 11]. In the alternative, the government argued that even if plaintiffs were entitled to an accounting by virtue of a trust relationship, the scope of that accounting only extended to their individual accounts, which would be equivalent to the quarterly headright checks or statements of deposit that plaintiffs already received. The court was persuaded by this argument, dismissing plaintiffs' claim for an accounting because, *inter alia*, "[u]nlike the trust account held for the Osage tribe, there is no underlying trust account with a balance for headright owners to examine." [Doc. 1164, p. 13].

Plaintiffs appealed the dismissal of the accounting claim. In *Fletcher II*, the circuit panel rejected the position that individual tribal members lacked the statutory right to seek and obtain an accounting. On remand, the government filed the administrative record, and the parties briefed

the scope of the government's accounting duty. The court noted that the nature and scope of the accounting sought by plaintiffs had expanded dramatically over time:

> Originally, plaintiffs only requested an accounting of trust distributions going back to 2002. They now seek an accounting of *both* receipts *and* distributions going back one-hundred and nine (109) years, to 1906. Further, their most recent request for trust receipts is not limited to information about the amount and source of money coming into the account, but rather includes such detailed information as the volume of oil and gas sold, the unit price, and the amount of mineral acreage that is not currently generating income. In short, the scope of the accounting requested by the plaintiffs has grown over the course of the litigation to a point where it is now almost completely unmoored from the original purpose for which the accounting was sought.

*Fletcher*, 153 F. Supp. 3d at 1369–70. Upon consideration of the circuit's guidance regarding the proper scope of the accounting, the court ordered the government to provide an accounting running from 2002 to the most recent quarter, including "a description of each receipt and distribution for the relevant accounting period." *Id.* at 1371. Plaintiffs appealed, and the Tenth Circuit affirmed. *Fletcher III*, 854 F.3d at 1207.

As to plaintiffs' accounting claim, the court concludes that the government's position was not substantially justified regarding plaintiffs' entitlement to an accounting, but its position was substantially justified regarding the scope of the accounting.

In sum, the government's positions on the voting rights claim, the wrongful distribution claim, and the scope of the accounting were substantially justified, but its position on plaintiffs' entitlement to an accounting was not substantially justified.

In assessing whether the government's position was substantially justified, the court must treat the case as an inclusive whole and base its decision on the totality of the circumstances. *United States v. Charles Gyurman Land & Cattle Co.*, 836 F.2d at 485. In that regard, the court finds that the most heavily litigated claim in this case was the claim of wrongful distributions to

persons who were not Osage Indians. When plaintiffs first sought an accounting in their First Amended Complaint filed in 2006, the request for an accounting was subordinate to and in furtherance of the claim that the government had wrongfully distributed royalty payments to persons who were not Osage Indians. *See* [Doc. 24, p. 8, ¶¶ 24–25, pp. 11–12, ¶¶ 1–3]. The same is true in both the Second and Third Amended Complaints. *See* [Doc. 97, p. 63, ¶ 31, pp. 70–71, ¶¶ 1–3] (requesting an accounting and audit of royalty distributions from the Osage Mineral Estate including whether payments "have been distributed only to Osage Indians (and their heirs)," and a reformation of trust funds after the completion of an accounting and audit showing the government failed to distribute royalties "only to Osage Indians"); [Doc. 985-1, p. 27, ¶ 53, p. 33, ¶¶ 1–3] (same). And although the accounting claim survived the 2012 dismissal of the wrongful distributions claim, it became unmoored from its original scope and purpose of identifying royalty payments to persons who were not Osage Indians. *See Fletcher*, 153 F. Supp. 3d at 1370 ("In short, the scope of the accounting requested by the plaintiffs has grown over the course of this litigation to a point where it is now almost completely unmoored from the original purpose for which the accounting was sought.").

"[T]he EAJA—like other fee-shifting statutes—favors treating a case as an inclusive whole . . . ." *Jean*, 496 U.S. at 161–62. Treating the case as an inclusive whole, and based on the totality of the circumstances, this court concludes that the government's position was substantially justified. Alternatively, this court finds and concludes that the government's position as a whole was substantially justified based on the more prominent claims.[4]

---

[4] *See Amezola-Garcia*, 835 F.3d at 555 ("[T]he Government's position 'as a whole' must be examined when determining the 'substantial justification' question, and an EAJA application fails if the multiple claims involved in the case are 'distinct' and if the more 'prominent' claims were substantially justified."); *Gatimi*, 606 F.3d at 350 ("The social-visibility issue was the more prominent issue and the government's position on that issue was substantially justified, and we therefore conclude that the government's position was substantially justified as a whole . . . .").

v.        <u>Denial or Reduction Based Upon Special Circumstances</u>

The court may deny or reduce an EAJA award if "special circumstances make an award unjust." 28 U.S.C. § 2412(d)(1)(A). Having determined that plaintiffs have not "incurred" fees, and because the government's position in the case as a whole was substantially justified, the court need not reach this issue.

b.        *Reasonableness of Plaintiffs' Requested Fees*

Having determined that plaintiffs have not "incurred" fees, and because the government's position in this case as a whole was substantially justified, the court need not address the reasonableness of the requested fees. However, the court notes that, in the event it becomes necessary to address the reasonableness of the request, plaintiffs' billing records [Doc. 1355-1] do not comply with the Order requiring the "identification, attribution, and separation of attorneys' fees and costs in relation to the claim on which plaintiffs prevailed." [Doc. 1348, p. 1]. *Hensley*, 461 U.S. at 440 ("the extent of a plaintiff's success is a crucial factor in determining the proper amount of an award of attorney's fees").

c.        *Plaintiffs' Request Pursuant to 28 U.S.C. § 2412(b)*

Plaintiffs also request fees and expenses under § 2412(b), which provides that "[t]he United States shall be liable for such fees and expenses to the same extent that any other party would be liable under the common law or under the terms of any statute which specifically provides for such an award." But a fee award under § 2412(b) is punitive, it "requires more than a showing of a weak or legally inadequate case," and is only appropriate "in exceptional cases and for dominating reasons of justice." *F.T.C. v. Kykendall*, 466 F.3d 1149, 1152 (10th Cir. 2006). Because plaintiffs have not made such a showing, their § 2412(b) request is denied.

## IV.    THE REQUEST FOR COSTS

"[C]osts against the United States . . . and its agencies may be imposed only to the extent allowed by law."  FED. R. CIV. P. 54(d)(1).  "[T]he statute authorizing an award of costs against the government is EAJA . . . ."  *Fruitt v. Astrue*, 604 F.3d 1217, 1219 (10th Cir. 2010).  Plaintiffs seek $47,681.77 in costs pursuant to 28 U.S.C. § 2412(a)(1), which provides:

> Except as otherwise specifically provided by statute, a judgment for costs, as enumerated in section 1920 of this title, but not including the fees and expenses of attorneys, may be awarded to the prevailing party in any civil action brought by or against the United States or any agency or any official of the United States acting in his or her official capacity in any court having jurisdiction of such action.  A judgment for costs when taxed against the United States shall, in an amount established by statute, court rule, or order, be limited to reimbursing in whole or in part the prevailing party for the costs incurred by such party in the litigation.

As the Tenth Circuit has recognized—and as is clear from the statutory language—recovery of costs under § 2412(a)(1) is permissible even where the United States' position was substantially justified.  *See F.T.C. v. Kuykendall*, 466 F.3d 1149, 1155 (10th Cir. 2006); *see also Neal & Co., Inc. v. United States*, 121 F.3d 683, 686 (Fed. Cir. 1997) ("Read together, sections 2412(a)(1) and 2412(d)(1)(A) clearly treat costs differently from fees.  These provisions create a distinct, though not unreasonable, trade-off.  Attorney fees and expenses must be awarded when the Government's position is not 'substantially justified.' 28 U.S.C. § 2412(d)(1)(A).  Costs, on the other hand, may be awarded to any prevailing party. 28 U.S.C § 2412(a)(1)."); *McLaughlin v. Hagel*, 767 F.3d 113, 120 (1st Cir. 2014) (noting that  it would have been error to apply the "substantially justified" test to plaintiff's request for costs under § 2412(a)(1)).

Thus, the threshold issues as to the award of costs are whether plaintiffs are prevailing parties, and whether the costs were "incurred" by plaintiffs.  28 U.S.C. § 2412(a)(1).  Both threshold issues are satisfied here.

"[T]hose costs recoverable against the United States under 28 U.S.C. § 2412(a)(1) are those listed in § 1920 of that title." *Kuykendall*, 466 F.3d at 1156. Section 1920 allows for the recovery of the following costs:

 (1) Fees of the clerk and marshal;

 (2) Fees for printed or electronically recorded transcripts necessarily obtained for use in the case;

 (3) Fees and disbursements for printing and witnesses;

 (4) Fees for exemplification and the costs of making copies of any materials where the copies are necessarily obtained for use in the case;

 (5) Docket fees under section 1923 of this title;

 (6) Compensation of court appointed experts, compensation of interpreters, and salaries, fees, expenses, and costs of special interpretation services under section 1828 of this title.

28 U.S.C. § 1920.

Plaintiffs cite *Kuykendall* for the proposition that the costs listed in § 1920 are recoverable as a matter of course under § 2412(a)(1). [Doc. 1353, pp. 11–12] (citing 466 F.3d at 1155–56). However, the issue in *Kuykendall* was whether § 1920 was the exclusive list of costs recoverable under § 2412(a)(1), not whether the standard for awarding costs under § 2412(a)(1) is mandatory or permissive. As this court has previously stated, an award of costs under § 2412(a)(1) is discretionary. [Doc. 1345, p. 3]; *see also* 28 U.S.C. § 2412(a)(1) ("[A] judgment for costs, as enumerated in section 1920 of this title, but not including the fees and expenses of attorneys, *may be awarded* to the prevailing party . . . .") (emphasis added).

The court previously ordered that the award of costs would be limited to those costs identified in plaintiffs' Bill of Costs at Doc. 1290. *See* Opinion and Order, [Doc. 1345, p. 3]; Order, [Doc. 1348, pp. 1–2]. Plaintiffs requested a total of $34,839.61, consisting of (a) $331.00 in fees of the Clerk; (b) $5,701.62 in fees for service of summons and subpoenas; (c) $574.65 in

fees for printed or electronically recorded transcripts necessarily obtained for use in the case; and (d) $28,232.34 in fees for exemplification and the costs of making copies of any materials where the copies are necessarily obtained for use in the case.

a.    *Fees of the Clerk*

Plaintiffs requested $331.00 for fees of the Clerk in their Bill of Costs.  [Doc. 1290].  They now request $605.00, representing their initial filing fee of $150.00 and $455.00 for an appellate filing fee paid in 2012.  The government objects to the $455.00 not included in the Bill of Costs, and notes that the $181.00 over the initial filing fee of $150.00 lacks explanation.  In reply, plaintiffs state they "had mistakenly included the filing fee for the first appeal—already awarded to Plaintiffs by the Tenth Circuit—instead of the filing fee from the 2012 appeal and corrected that in their Brief in Support of Bill of Costs."  But the appellate filing fee for the first appeal was $255.00, not $181.00, and the Circuit subtracted that fee from its award of costs, "as that fee is recoverable only in district court."  *See* [Doc. 14; Doc. 21].

Plaintiffs' request is limited by the amount requested in their Bill of Costs at Doc. 1290.  The court therefore finds that $331.00 in fees of the Clerk, representing $150.00 for the initial filing fee and $181.00 toward appellate filing fees, should be taxed to the government.

b.    *Fees for Service of Summons and Subpoenas*

Plaintiffs requested $5,701.62 in fees for service of summons and subpoenas of the Clerk in their Bill of Costs.  [Doc. 1290].  They now request $18,209.36: (1) $5,701.62 for secretary of state fees, automated mailing services, and service by publication; and (2) $12,507.74 for internal postage expenses.  The first component is compensable; the second is not.  Postage expenses are not compensable under § 1920.  *Ortega v. IBP, Inc.*, 883 F. Supp. 558, 562–63 (D. Kan. 2005); *Whitaker v. Trans Union Corp.*, No. 03-2551-CM, 2006 WL 2574185, at *1 (D. Kan. Aug. 8, 2006); *Hicks v. Astrue*, No. 11-cv-02883-MSK, 2013 WL 5609345, at *2 (D. Colo. Oct. 11, 2013).

The court therefore finds that $5,701.62 in fees for service of summons and subpoenas should be taxed to the government.

        c.       *Fees for printed or electronically recorded transcripts necessarily obtained for use in the case*

Plaintiffs request $574.65 for printed transcripts of court hearings necessarily obtained for their use in filing briefs the case. [Doc. 1290]. Upon review of the request and receipts submitted, the court finds that $574.65 should be taxed to the government.

        d.       *Fees for exemplification and the costs of making copies of any materials where the copies are necessarily obtained for use in the case, and fees and disbursements for printing*

In support of its request to tax costs, plaintiffs submitted invoices from an outside print shop for printing costs in the total amount of $12,106.16 [Doc. 1353-9], and an affidavit from the legal administrator at Sneed Lang, PC, showing an additional $16,186.60 in in-house copying costs [Doc. 1353-5, pp. 2–3, ¶ 4; Doc. 1353-10, p. 1, ¶ 2]. Plaintiffs necessarily incurred substantial printing costs in order to effectuate service of the Second Amended Complaint upon 1,740 non-Indian headright owners during the second half of 2009. The 1,740 defendants were added after the government prevailed on its motion that non-Indian headright owners were required and indispensable parties under FED. R. CIV. P. 19. The court finds that these printing/copying costs were reasonably incurred in order to provide the 1,740 additional defendants with copies of the pleadings. Moreover, plaintiffs were later required to provide copies of their court filings to the many *pro se* non-Indian headright owner defendants who did not receive filings electronically through CM/ECF. *See Whitaker*, 2006 WL2574185, at *3 (taxing cost of providing copies of filed documents to *pro se* opposing parties pursuant to Section 1920(3)). The court finds that the costs were incurred for copies necessarily obtained for use in the case. The $28,232.34 requested in the

Bill of Costs shall be taxed to the government for printing and copying costs pursuant to § 1920(3) and (4).

In sum, the court taxes a total of $34,839.61 in EAJA costs, consisting of $331.00 in filing fees, $5,701.62 in fees for service of summons and subpoenas, $574.65 in transcript costs, and $28,232.34 in copying costs.

## V.    CONCLUSION

For the reasons set forth above, plaintiffs' Motion for Attorney Fees and Costs [Doc. 1353] is granted in part and denied in part.  The court denies plaintiffs' motion for attorney fees and grants plaintiffs' motion for costs in the amount of $34,839.61.

IT IS SO ORDERED this 21st day of February, 2019.

GREGORY K. FRIZZELL, CHIEF JUDGE